BOLLER BEVERAGES, INC., PETITIONER, v. WILLIAM HOWE DAVIS, DIRECTOR OF THE DIVISION OF ALCOHOLIC BEVERAGE CONTROL, ETC., DEFENDANT.

Argued January 8, 1962—Decided June 29, 1962.

*Mr. Joseph M. Jacobs* argued the cause for petitioner (*Messrs. Harrison and Jacobs,* attorneys; *Mr. Jacobs,* of counsel).

*Mr. Samuel B. Helfand,* Deputy Attorney General, argued the cause for defendant (*Mr. David D. Furman,* Attorney General of New Jersey, attorney; *Mr. Helfand,* of counsel).

The opinion of the court was delivered by

HALL, J. The Director of the Division of Alcoholic Beverage Control specially ruled that the sale of a brand of

corn whiskey was illegal in New Jersey when packaged in Mason or fruit jars. Petitioner, a licensed wholesaler of this State handling the product, appealed to the Appellate Division, treating the Director's action as the final decision of a state administrative agency, *R. R.* 4:88–8, and, by the same pleading, considering the action as an administrative rule promulgated by a state agency, sought a review of validity through the declaratory judgment procedure, *R. R.* 4:88–10. We certified the case on our own motion before hearing in the Appellate Division. The matter involves important aspects of the powers of the Director and the manner of exercise thereof.

From the stipulated record we are advised that in 1958 Viking Distillery, Inc., of Albany, Georgia, began to manufacture and sell in interstate commerce a product called "Georgia Moon Corn Whiskey," under the authorized trade name of The Johnson Distilling Co. and appropriate federal distiller's basic permit. The whiskey, a colorless liquid, was marketed in conventional beverage bottles, having a neck and narrow mouth, in two sizes, pint and fifth (4/5ths of a quart or 1/5th of a gallon). The labels were also of conventional style and identified the contents as 90 proof and less than 30 days old. Petitioner, undertaking to sell the product to retailers in New Jersey, filed with the Director in 1960 the necessary quarterly listings of minimum prices for wholesale and retail sales as prescribed by his Regulations Nos. 34 and 30. Such listings show the brand name and the respective prices for the differing size bottles in which the product is sold.

In the latter part of 1960 the distiller commenced to market the whiskey also in an open-mouthed cylindrical bottle with a screw-on cap, identical in shape with the common Mason or fruit jar. It held a fifth and bore an unconventional style label. All federal approvals required for the new container and label were obtained. Petitioner started to sell it at wholesale in New Jersey late in 1960 or early in 1961. Since the wholesale and retail minimum

prices were the same at inception as for the regular fifth, no notice of the new packaging was given to the Director. A higher price and difference in proof from the conventional bottle were, however, decided upon in the early part of 1961, which necessitated separate listings. Consequently in February of that year petitioner filed listings for the quarter commencing April 1, specifying one price and proof for "Mason Jar" fifths and another for "Regular Bottles."

The brand name "Georgia Moon" in conjunction with the specification of the "Mason Jar" container excited the Director's interest and he called for further information. His concern arose because a Mason or fruit jar apparently is the traditional container for illicit or "moonshine" whiskey, particularly in certain sections of the country, and the "Georgia Moon" brand name also invoked a similar connotation. Personal and telephone conversations and letter communications between petitioner, the distiller and the Director followed. No formal proceeding was instituted or trial type hearing held.

The upshot was the ruling complained of, contained in the Director's letter to petitioner, dated March 1, 1961. Although disturbed by the connotations of the brand name, he agreed to continue to accept regular bottle listings thereunder, but concluded as follows concerning the jar container:

"The Director finds the Mason jar objectionable for a number of reasons, including the fact that 'moonshine' has been traditionally packaged in Mason jars and he does not approve of what may have the appearance of illicit whiskey being sold or dispensed on licensed premises. Furthermore, this Division has disapproved other containers which, as in the case of Mason jars, have other utilitarian uses, when empty."

He did not refer to any statutory section or regulation as authority for the ruling.

In subsequent correspondence, petitioner indicated a desire to make known "certain facts and conclusions" before "this action is closed." The Director in reply, while indicating

willingness to discuss the matter further, directed the removal of all jar containers from the New Jersey retail market since their sale was illegal. He further stated that his decision was not based solely on the fact that the jar is a refillable container. A later conference took place but the ruling remained unchanged and this action was commenced shortly thereafter. The ruling has been complied with pending the outcome of the litigation.

Prior to the ruling petitioner and the distiller urged upon the Director the federal approval of the new packaging and the fact that the product was being sold in this fashion in 25 or more states. They further contended that marketing in the jar container was "doing more to combat moon-shining than all the enforcement agencies combined" because it gave "the normal moon-shine drinker a safe, legal tax paid product that is similar to what he likes to drink," thereby "competing with his normal supplier, and making [the moon-shiner's] business less profitable." Also submitted to the Director were magazine articles commenting on the new form of packaging as an effective sales "gimmick."

In response to the Director's initial request for further information, petitioner furnished him with a label sample, required as a prerequisite to sale at wholesale or retail of any alcoholic beverage by Regulation No. 30, Rule 1. Through error the label submitted was that for the conventional bottle rather than the one used on the jar. (No point is made of the mistake.) The jar label apparently did not come to his attention until after the ruling was made. Copies are included in the stipulated record and, by agreement, we have also been furnished with samples of the jar, the cardboard carton in which it is placed for retail sales and a pamphlet or brochure of drink recipes packed in the carton. At oral argument we were advised that the Director also finds the label and pamphlet objectionable and perhaps the carton as well. His objection is based not only on the connection of the printed materials with the jar type container, but also because he believes them to be lacking

in good taste and unduly designed to stimulate or increase consumption of alcoholic beverages. We take it the parties desire that we consider the Director's ruling as if it had banned them as well for the reasons just recited. Since both phases of the matter involve the same fundamental issues of administrative power and its exercise, we are willing to comply with the request despite the irregularity of the presentation. The fact that the case must turn on these basic questions makes unnecessary full description of the printed matter.

Petitioner's first contention is that a state lacks authority to bar the jar container, the label and the other items. The petition alleges that "the label and container in question has been approved by the Federal Alcoholic Administration and defendant has no power to render illegal in New Jersey the sale of a product which is permitted on a national basis * * *." While the basis of the point is not clearly articulated, we must assume it to be that, since the distiller here has met all federal requirements with respect to bottles and labels of liquor moving in interstate commerce, New Jersey is barred from imposing further or different regulation of the subject because such would violate the Commerce Clause of the Federal Constitution or would be intruding upon a field which the national government has already exclusively occupied. The contention necessitates some consideration of the pattern of federal regulation of alcoholic beverages and its relation to state authority.

On the one hand, it is clear that the Twenty-First Amendment did not give to the states complete and exclusive control over commerce in intoxicating liquors and that the power of Congress to regulate foreign and interstate commerce therein continues except as modified by the amendment. *William Jameson & Co. v. Morgenthau*, 25 *F. Supp.* 771 (*D. D. C.* 1938), decree vacated on procedural grounds, 307 *U. S.* 171, 59 *S. Ct.* 804, 83 *L. Ed.* 1189 (1939); *U. S. v. Frankfort Distilleries, Inc.*, 324 *U. S.* 293, 65 *S. Ct.* 661, 89 *L. Ed.* 951 (1945). *Cf. Motor Cargo, Inc. v.*

*Division of Tax Appeals,* 10 *N. J.* 580 (1952). As Mr. Justice Black said in his concurring opinion in *Carter v. Virginia,* 321 *U. S.* 131, 64 *S. Ct.* 464, 88 *L. Ed.* 605, 612 (1944), "Though the precise amount of power [the Amendment] has left in Congress to regulate liquor under the Commerce Clause has not been marked out by decisions, this much is settled: local, not national, regulation of the liquor traffic is now the general Constitutional policy."

So, conversely, the amendment sanctions the right of a state to legislate concerning alcoholic beverages brought from without, unfettered by the Commerce Clause, and bestowed upon the states broad regulatory powers over the liquor traffic within their borders. *Ziffrin v. Reeves,* 308 *U. S.* 132, 60 *S. Ct.* 163, 84 *L. Ed.* 128 (1939); *U. S. v. Frankfort Distilleries, Inc., supra.* As the court said in *Ziffrin:*

> "Without doubt a state may absolutely prohibit the manufacture of intoxicants, their transportation, sale, or possession, irrespective of when or where produced or obtained, or the use to which they are to be put. Further, she may adopt measures reasonably appropriate to effectuate these inhibitions and exercise full police authority in respect of them * * *
>
> Having power absolutely to prohibit manufacture, sale, transportation, or possession of intoxicants, was it permissible for Kentucky to permit these things only under definitely prescribed conditions? Former opinions here make an affirmative answer imperative. The greater power includes the less * * *. The state may protect her people against evil incident to intoxicants * * * and may exercise large discretion as to means employed." (308 *U. S.,* at *p.* 138, 60 *S. Ct.,* at *p.* 167, 84 *L. Ed.,* at *p.* 135.)

The concept was expressed in *Frankfort Distilleries, Inc.,* as "the state's full authority to determine the conditions upon which liquor can come into its territory and what will be done with it after it gets there * * *" (324 *U. S.,* at *p.* 299, 65 *S. Ct.,* at *p.* 664, 89 *L. Ed.,* at *p.* 956.) In terms of the Commerce Clause, Mr. Justice Frankfurter put the matter this way in his concurring opinion in the same case:

"The Twenty-First Amendment made a fundamental change, as to control of the liquor traffic, in the constitutional relations between the States and national authority. Before that Amendment—disregarding the interlude of the Eighteenth Amendment—alcohol was for constitutional purposes treated in the abstract as an article of commerce just like peanuts and potatoes. As a result, the power of the States to control the liquor traffic was subordinated to the right of free trade across state lines as embodied in the Commerce Clause. The Twenty-First Amendment reversed this legal situation by subordinating rights under the Commerce Clause to the power of a State to control, and to control effectively, the traffic in liquor within its borders." (324 *U. S.*, at *p.* 300, 65 *S. Ct.*, at *p.* 665, 89 *L. Ed.*, at *p.* 957.)

To turn to the federal statutes and regulations concerning bottles and labels for packaging distilled spirits: The statute relating to bottles is contained in the Internal Revenue Code, now found in 26 *U. S. C. A.* § 5301 (*Supp.* 1962), *Pub. L.* 85–859, *Title* II, § 201, Sept. 2, 1958, 72 *Stat.* 1374. It reads:

"Whenever in his judgment such action is *necessary to protect the revenue*, the Secretary [of the Treasury] or his delegate is authorized by the regulations prescribed by him and permits issued thereunder if required by him—

(1) to regulate the kind, size, branding, marking, sale, resale, possession, use, and reuse of containers \* \* \* designed or intended for use for the sale of distilled spirits \* \* \*" (Emphasis added)

The regulations promulgated pursuant thereto, 26 *C. F. R.* § 175.1 to § 175.123, inclusive, deal comprehensively with the manufacture, marking, labeling, use and shipment of liquor bottles. No permit is required for the use of any bottle unless it is of unique and distinctive shape or design, 26 *C. F. R.* § 175.56 to § 175.59, inclusive, and only for the purpose of assuring that its use will not "afford a jeopardy to the revenue." 26 *C. F. R.* § 175.57.

 It is, therefore, apparent that the object of federal bottle regulation is solely to protect the federal · revenue, a valid exercise of national power. *U. S. v. Goldberg,* 225 *F. 2d* 180 (8 *Cir.* 1955). The so-called federal ap-

proval of the Mason jar in the instant case amounted to no more than a declaration that this form of container was not a distinctive liquor bottle as defined by these revenue-protecting regulations and that no special permit was required for its use.

Federal control over labels derives from the Federal Alcohol Administration Act of 1935, 27 *U. S. C. A.* § 201 *et seq.* (*Supp.* 1962). The statute deals with a variety of matters within the sphere of national power. It first requires, "[in] order effectively to regulate interstate and foreign commerce in distilled spirits, wine, and malt beverages, to enforce the twenty-first amendment, and to protect the revenue and enforce the postal laws with respect to distilled spirits, wine, and malt beverages" (§ 203), a basic permit from the Secretary of the Treasury, *inter alia,* to engage in the business of distilling spirits, §§ 203 and 204. The provisions respecting labeling, and comparable ones dealing with advertising, are found in § 205, the purpose and intended scope of which are plain from the caption: "Unfair competition and unlawful practices." The section also regulates exclusive outlets, the "tied house," commercial bribery and consignment sales. One aim of these latter provisions has been defined to be the prohibition of practices analogous to those proscribed by the federal anti-trust laws. *Black v. Magnolia Liquor Co.,* 355 *U. S.* 24, 78 *S. Ct.* 106, 2 *L. Ed.* 2d 5 (1957).

The labeling provisions in subsection (e) thereof make it unlawful to sell, ship or deliver in interstate or foreign commerce "any distilled spirits, wine, or malt beverages in bottles, unless such products are bottled, packaged, and labeled in conformity with such regulations, to be prescribed by the Secretary of the Treasury, with respect to packaging, marking, branding, and labeling and size and fill of container" as will, in specified particulars, protect the consumer from deception and prohibit unfair practices. The fundamental purpose is obviously to require the furnishing of full and accurate information to the consumer as to the

exact nature, quality and quantity of the product. *William Jameson & Co. v. Morgenthau, supra* (25 *F. Supp.* 771); *Continental Distilling Corporation v. Humphrey,* 101 *U. S. App. D. C.* 210, 247 *F. 2d* 796 (*D. C. Cir.* 1957). The implementing regulations, 27 *C. F. R.* § 5.1, *et seq.,* deal with the particulars mentioned in the statute in great detail and provide that no person shall bottle distilled spirits or remove the same from his plant without first obtaining a "Certificate of Label Approval" evidencing that the label complies with all requirements of the regulations. 27 *C. F. R.* § 5.50. Petitioner's approval of the label affixed to the jar container, therefore, goes no further than evidencing compliance with these standards imposed only for the purposes mentioned in the valid exercise of federal authority.

In view of the vast reservoir of power bestowed upon the states to regulate the liquor traffic and protect against its evils within their borders pretty much as they see fit, we can see no sound reason why additional state regulation of bottles and labels to further legitimate local policy could be said to run afoul of the Commerce Clause of the Federal Constitution. While no reported decision involving the precise question has been found, the United States Supreme Court has gone to great lengths in sustaining other highly restrictive state regulation which undoubtedly greatly affected interstate commerce. *State Board of Equalization v. Young's Market Co.,* 299 *U. S.* 59, 57 *S. Ct.* 77, 81 *L. Ed.* 38 (1936); *Mahoney v. Joseph Triner Corp.,* 304 *U. S.* 401, 58 *S. Ct.* 952, 82 *L. Ed.* 1424 (1938); *Indianapolis Brewing Co. v. Liquor Control Com., Mich.,* 305 *U. S.* 391, 59 *S. Ct.* 254, 83 *L. Ed.* 243 (1939); *Joseph S. Finch & Co. v. McKittrick,* 305 *U. S.* 395, 59 *S. Ct.* 256, 83 *L. Ed.* 246 (1939); *Ziffrin v. Reeves, supra* (308 *U. S.* 132, 60 *S. Ct.* 163, 84 *L. Ed.* 128); *Carter v. Virginia, supra* (321 *U. S.* 131, 64 *S. Ct.* 464, 88 *L. Ed.* 605). This court's decision in the factually very different case of *Motor Cargo, Inc. v. Division of Tax Appeals, supra* (10 *N. J.* 580) does

not suggest the contrary. Nor do the federal bottle and label regulations earlier summarized, considering their limited nature and purpose, amount to federal occupation of the field to the exclusion of state action, even if that concept has any proper place here, a subject which we need not consider. Again no exact precedent has been located, but decisions in other states lend support to the conclusion. In *Terre Haute Brewing Co. v. Liquor Control Comm.*, 291 *Mich.* 73, 288 *N. W.* 339 (1939), the Michigan Supreme Court upheld the action of that state's authorities in refusing state approval of a federally approved label used by an out-of-state brewer because it was too much like one already authorized for a local manufacturer, an item not covered by the federal regulations. *Cf. State ex rel. American Distilling Co. v. Patterson,* 133 *Conn.* 345, 51 *A.* 2d 141 (*Sup. Ct. Err.* 1947). In neither case does it appear that any federal question was raised. One can only surmise it was thought such a contention would be too lacking in merit.

The states not being federally precluded from additional regulation of bottles and labels in furtherance of state policies and interests, the next and decisive question is whether New Jersey has exercised regulatory power over these items so as to ground solidly enough the Director's ruling under review. Petitioner claims that neither the Alcoholic Beverage Control Act, *N. J. S. A.* 33:1–1, *et seq.*, nor any general rule or regulation promulgated by the Director thereunder furnishes the necessary basis and that his "special ruling" is nothing but an *ad hoc* administrative determination without adequate foundation and therefore an improper exercise of administrative power. The Director replies that his action, even if not springing from any particular statutory section or regulation, finds sanction in the *sui generis* nature of alcoholic beverage control, in his sweeping discretionary power to carry out the broad purposes expressed in the statute and, more particularly, in the explicit authority given him by *N. J. S. A.* 33:1–39 to "make * * * special rulings and findings."

In considering the question presented, it is important to have in mind the purposes of alcoholic beverage. regulation in this State and the scheme of control which has been set up to carry out those policies. And in this field, one always starts with the proposition that the business, so prone to evils, is one not of right and is peculiarly subject to strict governmental control in every phase. Therefore the authority to regulate is broadly said to be practically limitless. *Franklin Stores Co. v. Burnett*, 120 *N. J. L.* 596, 598 (*Sup. Ct.* 1938); *Hudson Bergen County Retail Liquor Stores Association v. Hoboken*, 135 *N. J. L.* 502, 503 (*E. & A.* 1947); *Mazza v. Cavicchia*, 15 *N. J.* 498, 505–506 (1954); *X-L Liquors v. Taylor*, 17 *N. J.* 444, 449 (1955); *Fanwood v. Rocco*, 33 *N. J.* 404, 411–412 (1960).

The act, adopted in 1933 upon repeal of the Eighteenth Amendment, in an early section succinctly specifies the aims and objects of state regulation, "to promote temperance and eliminate the racketeer and bootlegger," *N. J. S. A.* 33:1–3, and concludes by stating that it "is intended to be remedial of abuses inherent in liquor traffic and shall be liberally construed," *R. S.* 33:1–73. Parenthetically, it may be observed that these purposes have quite a different orientation from those underlying federal regulation.

The statute provides for the details of regulation by two methods. First, it specifies with particularity how many of the varied aspects of the business shall be conducted and controlled. Second, it reposes in the Director legislative power to fill in the gaps and add to the precise statutory mandates through the exercise of comprehensive rule-making powers, *N. J. S. A.* 33:1–39, –39.1 and –39.2. These powers enable the Director to effectively carry out his duty "to supervise the manufacture, distribution and sale of alcoholic beverages in such a manner" as to accomplish the objects of the law, *N. J. S. A.* 33:1–3, "to administer and enforce" the chapter, and "to do, perform, take and adopt all other acts, procedures and methods designed to insure the fair,

impartial, stringent and comprehensive administration" thereof, *R. S.* 33:1–23.

The delegation of rule-making authority is broad indeed. *Section* 39 spells it out: "The [Director] may make such general rules and regulations and such special rulings and findings as may be necessary for the proper regulation and control of the manufacture, sale and distribution of alcoholic beverages and the enforcement of this chapter, in addition thereto, and not inconsistent therewith \* \* \*." It then goes on in a second paragraph to specify some 30 detailed categories which general rules and regulations may cover, some of which relate to matters also the subject of specific statutory sections and others of which are not otherwise mentioned in the act, and winds up with sweeping authority to promulgate regulations relating to "practices unduly designed to increase consumption of alcoholic beverages \* \* \* and such other matters whatsoever as are or may become necessary in the fair, impartial, stringent and comprehensive administration" of the law. The Director has exercised this power fully through the making of voluminous regulations and the courts have consistently and sympathetically sustained them in view of the nature and inherent evils of the business, the policies and aims expressed by the Legislature and the broad grant of authority. *e. g., X-L Liquors v. Taylor, supra* (17 *N. J.* 444); *Mazza v. Cavicchia, supra* (15 *N. J.,* at *pp.* 506–509).

The theory of administrative rule-making is, of course, that in certain fields and in certain respects the public interest is better served by delegating a large part of detailed lawmaking to the expert administrator, controlled by policies, objects and standards laid down by the legislature, rather than by having all the details spelled out through the traditional legislative process. Administrative rule-making remains in essence, however, the enactment of legislation of general application prospective in nature. The object is not legislation *ad hoc* or after the fact, but rather the promulgation, through the basic statute

and the implementing regulations taken as a unitary whole, of a code governing action and conduct in the particular field of regulation so those concerned may know in advance all the rules of the game, so to speak, and may act with reasonable assurance. Without sufficiently definite regulations and standards administrative control lacks the essential quality of fairly predictable decisions. Persons subject to regulation are entitled to something more than a general declaration of statutory purpose to guide their conduct before they are restricted or penalized by an agency for what it then decides was wrong from its hindsight conception of what the public interest requires in the particular situation.

Reverting to the precise question before us, we have no doubt that New Jersey may, by legislation or general rule, reasonably regulate bottles and labels in furtherance of any of the general statutory purposes or pursuant to any specific statutory provision. But the question is, has it done so? We are not referred to any specific provision of the act dealing with either subject nor do we find any regulation concerning bottles. The Director has, however, legislated with respect to labels. By Regulation 24, he says that federal regulations relating to labeling "are made a part hereof and shall also apply to alcoholic beverages packaged purely for intrastate shipment within New Jersey." We take it this means that he has adopted the federal regulations as his own and has gone no further. There is, of course, no contention that the label in question transgresses the federal enactment in any particular. In passing it may be noted that no warrant for the Director's action here may be found under his regulations requiring the listing of minimum resale prices before any alcoholic beverage may be sold in the State at wholesale or retail. These regulations make no reference to any requirements as to the packaging of beverages and have for their only object the promotion of temperance and the prevention of undue stimulation of sales, goals aimed at by prohibition

of indiscriminate price cutting. *Butler Oak Tavern v. Division of Alcoholic Beverage Control,* 20 *N. J.* 373, 385 (1956); *Duff v. Trenton Beverage Co.,* 4 *N. J.* 595, 608 (1950). We must conclude there is no statutory provision which itself directly governs nor is there an implementing regulation which can ground the Director's action in this case.[1]

This brings us to the Director's principal reliance—the power to make "special rulings and findings" given him by *N. J. S. A.* 33:1–39, previously quoted. He urges in effect that this provision gives him authority to legislate on a case-to-case basis, as distinct from the method of general prospective rules and regulations, at least in all those categories of control which *section* 39 thereafter specifies as proper subjects of general regulations. As has been pointed out the latter categorization is so sweeping as to be practically all-encompassing. We cannot agree with the Director's thesis.

The scope of "special rulings and findings" is not at all clear, but it is not necessary here that we precisely define the full boundaries. It is enough to decide whether the instant situation is legitimately included within them. The term is not found, so far as we have been able to discover,

---

[1] Since the ruling in question the Director has promulgated Rule 6 of Regulation No. 21 which provides that

"No manufacturer, importer, wholesaler or retailer shall include in any advertising material or other advertisement, directly or indirectly, in any manner or by any means, device or medium;
\* \* \* \* \* \* \* \*

(b) Any statement, design, device, matter or representation which is obscene or indecent or which is obnoxious or offensive to the commonly and generally accepted standards of fitness and good taste; \* \* \*

(n) Any statement of a nature which fosters or tends to foster or encourage intemperance; \* \* \*"

The question is not raised as to the effect of this rule on the pamphlet of drink recipes packed in the carton wtih the liquor jar. We therefore express no opinion on the validity of the rule or its applicability here.

in any other of our administrative agency statutes and this appears to be the first case in which its meaning has been involved. First let it be said that on the face of the statute itself we are unable to divine a legislative intent to empower *ad hoc* lawmaking in the categories in which the promulgation of general rules and regulations is authorized. The paragraph of the section listing such categories refers only to "rules and regulations" and makes no mention of "special rulings and findings."

We recognize full well that by the very nature of the administrative process, including as it does both legislative and executive functions in one body or person, and in the necessary day-to-day working of that process, an agency is confronted continually with requests for concrete interpretation or construction of its regulations and for advance views on whether certain proposed conduct or activity is permissible, which most agencies respond to as a matter of routine. On his own initiative, the administrator may also find it important to issue more detailed interpretations or applications of the statute and his regulations for the future guidance of all persons who may be affected. (We are speaking of so-called rulings which have sufficient formality and dignity to go beyond the point of what have been called advisory opinions, though the line may be shadowy. See *Rutherford Lodge No. 547 v. Hock*, 1 *N. J. Super.* 223 (*App. Div.* 1949); *Passaic County Retail Liquor Dealers Association v. Board of Alcoholic Beverage Control*, 37 *N. J. Super.* 187, 194–197 (*App. Div.* 1955).) And this kind of ruling may partake of both rule-making and adjudication, thus fuzzing over two theoretically distinct processes. See *In re Port Murray Dairy Co.*, 6 *N. J. Super.* 285, 293 (*App. Div.* 1950). It is also of interest to note that this power has been viewed as inherent in the administrative process or arising by necessary implication and is not dependent on express statutory grant. 1 *Davis, Administrative Law Treatise* 271 (1958), citing *Electrolux Corp. v. Miller*, 286 *N. Y.* 390, 36 *N. E.* 2d 633 (*Ct. App.* 1941).

 Highly desirable it is, in the interest of convenient, expeditious and efficient administration, that this sensible course of action be permitted full rein. See *Central Home Trust Co. v. Gough,* 5 *N. J. Super.* 295, 300 (*App. Div.* 1949). We think the type of administrative action we have been discussing certainly falls within the permissible scope of "special ruling." Perhaps we should add that such rulings are, moreover, subject to judicial review, *cf. Kravis v. Hock,* 136 *N. J. L.* 161, 164 (*E. & A.* 1947); *City of Passaic v. Kingsley,* 47 *N. J. Super.* 265, 268 (*App. Div.* 1957), certif. .den. 26 *N. J.* 170 (1958), and that if the ruling is directed at a specific situation involving a single interest, the dissatisfied party should also be first entitled to a trial-type hearing in the agency, if he desires it, before attacking the ruling in the courts. *Cf. Bechler v. Parsekian,* 36 *N. J.* 242 (1961).

 What the Director has done in the instant case, however, goes far beyond the type of administrative action mentioned and any acceptable scope or exercise of this nebulous power. This was not a request by an interested party for an advance view of legality or an interpretation or construction of an existing statute or regulation of general application. It amounts to *ad hoc* legislation and a simultaneous determination of violation thereof in a particular situation, on the Director's own initiative and without a trial-type hearing, where prior thereto the alleged transgression had not been covered or proscribed by statute or regulation. See *Mitchell v. Cavicchia,* 29 *N. J. Super.* 11, 15 (*App. Div.* 1953). Whatever are the outer limits of "special ruling or finding," this is not within them, and for sound reason. As has already been pointed out, it is the antithesis of legislation to make law from case to case and after the fact. Where an administrative agent is given full rule-making power, he must in all fairness, bottom an alleged violation on general legislation before he may rule in a particular case. The general mandate, either statutory or administrative, must precede the specific violation. *Cf.*

*Kravis v. Hock, supra* (136 *N. J. L.* 161). The ruling cannot be sustained.

Since the Director has not legislated to cover the instant situation, it would be inappropriate for us to advise or speculate concerning what would constitute valid regulation of the subject matter. That question can only be determined on review of any pertinent rules hereafter promulgated. It is therefore unnecessary to consider petitioner's arguments that the Director's ruling was factually arbitrary and that the reasons he gave therefor were without sound basis, as well as the contention that it was denied due process because the ruling was made without a trial-type hearing.

The action of the Director is set aside.

*For reversal*—Chief Justice WEINTRAUB, and Justices FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For affirmance*—None.