ANDREW, J. T. C.
In this proceeding Metromedia, Inc., seeks a review of a decision of the Director, Division of Taxation, revising its business allocation factor for purposes of the Corporation Business Tax Act (N.J.S.A. 54:10A-1 et seq.) for the tax years 1972 through 1975.
The New Jersey Corporation Business Tax Act imposes a franchise tax on all nonexempt foreign and domestic corporations “for the privilege of having or exercising its corporate *399 franchise in this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State.” N.J.S.A. 54:10A-2. The tax is computed by adding together prescribed percentages of a net worth tax base and a net income tax base. N.J.S.A. 54:10A — 5. In the case of a taxpayer corporation maintaining a regular place of business outside this State (other than a statutory office), an allocation factor is first applied to its net worth and net income tax bases so that only that portion of the taxpayer’s net worth and net income attributable to its corporate activity in New Jersey is utilized in the computation of its tax. N.J.S.A. 54:10A-6. In this case the court must determine whether defendant Director, Division of Taxation, was correct in adjusting the allocation factor reported by plaintiff Metromedia, Inc., to reflect the New Jersey portion of the viewing and listening audiences of plaintiff’s radio and television stations. The tax years of 1972 through 1975 are at issue.
Plaintiff is a Delaware corporation engaged primarily in the ownership and operation of television and radio broadcasting stations. Plaintiff’s other business activities include outdoor and transit advertising, the production and distribution of television programs, the presentation of touring ice shows, the operation of indoor ice skating rinks and a recreational park, the operation of a direct mail advertising business and the publication of street address directories.
During the years in question plaintiff owned and operated five very high frequency (VHF) television stations, one ultra high frequency (UHF) television station, five AM radio stations and seven FM radio stations in the United States. Five of these stations serviced the New York and Philadelphia metropolitan areas. These were television station WNEW and radio stations WNEW-AM and WNEW-FM, located in New York City, and radio stations WIP-AM and WMMR-FM, located in Philadelphia. These stations generated revenue for plaintiff by selling television and radio air time to network, national and local advertisers. Advertising rates were based primarily on the size of the listening or viewing audience in the area served by the station, *400 and the ability of the station to attract an audience as reflected in surveys made by independent rating services.
The sale of air time on the stations was achieved by salespeople employed by the individual stations. Each station operated independently of every other station and had its own management, staff and sales personnel. The stations were in competition with each other in their efforts to attract a share of the advertising business in the broadcast area. The salespeople worked through advertising agencies rather than with the advertisers directly. The advertising agencies earned a percentage of the advertising revenues as a commission for the successful solicitation of advertisers. The remaining portion of the advertising revenues became plaintiff’s receipts. It is the treatment of the receipts of plaintiff’s five New York and Philadelphia stations that is the subject of this controversy.
During the years in question no part of the sales force employed by any of the five stations was located or operated in New Jersey. There were no salespeople located in New Jersey, no sales offices located in New Jersey, and no monies were collected in New Jersey. The majority of the advertising agencies with which the salespeople dealt were located in New York City. None were located in New Jersey. All sales contracts were approved in New York, and all commercials were aired at the location of the station, either in New York or Philadelphia.
During the taxable years in issue only WNEW-AM and WIP-AM maintained any property in the State of New Jersey.[1] WNEW-AM operated a transmitter facility in Carlstadt, New Jersey, and a similar facility was operated by WIP-AM in Bellmawr, New Jersey. The Carlstadt property contained a one-story concrete block building housing a transmitter and emergency generator, and four broadcast towers. The Bellmawr property also contained a one-story concrete block building housing a transmitter and emergency generator, and two *401 broadcast towers. During the relevant period plaintiff employed three full-time shift employees at the Carlstadt site who rendered engineering and maintenance services. No employees were based at the Bellmawr facility. Philadelphia based employees performed part-time maintenance services at that site averaging 16 to 24 hours a week.
Each of plaintiff’s New York and Philadelphia radio and television stations transmitted a signal that reached a specified geographical area known as a “primary coverage area.” All five of the stations had a primary coverage area that included areas within New Jersey. For the tax years in question approximately 30% of the total listening and viewing audience in the primary coverage areas for WNEW-TV, WNEW-AM and WNEW-FM, and approximately 21% of the total listening audience in the primary coverage areas for WIP-AM and WMMRFM, was located in New Jersey. Although there was no specific proof in this regard, it can logically be assumed that the stations’ advertisers most likely considered the entire geographical makeup of the stations’ audiences in their decision to purchase advertising time.
The stations’ programming consisted primarily of entertainment events directed at the entire listening and viewing community. Each station also broadcast news and public affairs events of interest to its audience and which concerned the geographic area within the confines of its signal. In addition, regulations of the Federal Communications Commission (FCC) required the stations to air public service programming directed to the viewing and listening community.
Plaintiff filed corporation business tax returns for each of the years 1972 through 1975.[2] Since plaintiff’s regular place of business was located outside New Jersey, it prepared its returns in accordance with N.J.S.A. 54:10A-6, which provides that for *402 such corporations the portion of its net worth and net income to be used as a measure of its tax liability shall be determined by multiplying such net worth and net income
... by an allocation factor which shall be the average of the fractions computed in (A), (B) and (C) below, or of so many of them as may be applicable, that is:
(A) The average value of the taxpayer’s real and tangible personal property within the State during the period covered by its report divided by the average value of all the taxpayer’s real and tangible personal property wherever situated during such period;
(B) The receipts of the taxpayer, computed on the cash or accrual basis according to the method of accounting used in the computation of its net income for Federal tax purposes, arising during such period from
(1) sales of its tangible person property located within this State at the time of the receipt of or appropriation to the orders where shipments are made to points within this State,
(2) sales of tangible personal property located without the State at the time of the receipt of or appropriation to the orders where shipment is made to points within the State,
(3) Deleted by amendment.
(4) services performed within the State,
(5) rentals from property situated, and royalties from the use of patents or copyrights, within the State,
(6) all other business receipts ... earned within the State, divided by the total amount of the taxpayer’s receipts, similarly computed, arising during such period from all sales of its tangible personal property, services, rentals, royalties and all other business receipts, whether within or without the State;
(C) The total wages, salaries and other personal service compensation, similarly computed, during such period of officers and employees within the State divided by the total wages, salaries and other personal service compensation, similarly computed, during such period of all the taxpayer’s officers and employees within and without the State. [N.J.S.A. 54:10A-6.]
Plaintiff allocated its net worth and net income using the three-factor formula (property, payroll and receipts) prescribed by the statute. In computing the property and payroll fractions, with respect to WNEW-AM and WIP-AM, plaintiff took into account its broadcast towers and transmission facilities located in New Jersey, as well as all sums expended for employee compensation in connection with the maintenance and servicing of these properties. As far as the remaining stations were concerned, plaintiff, in computing the property .and payroll fractions, took into account the fact that these stations neither owned nor operated any property in New Jersey and made no payments with regard to services performed within the State.
*403 For all the years in question plaintiff claimed a zero receipts fraction, relying on the fact that all the receipts of these stations were derived from sales of advertising time that took place either in New York or Philadelphia. No sales were consummated in New Jersey, nor were any sales attributable to any business activities that took place in New Jersey. The tax returns filed by plaintiff reflected the following allocation factor computations:
1972 1973 1974 1975
Property fraction 3.5083% 3.0654% 2.740% 2.6544%
Payroll fraction .1389 .1251 .171 .0903
Receipts fraction -0--0--0--0-
Allocation factor (average of the three fractions) 1.2157% 1.0635% .9703% .9149%
After an audit of plaintiff’s returns, defendant determined to adjust the allocation factors reported by plaintiff on the authority of N.J.S.A. 54:10A-8 (“Adjustment of allocation factor”), which provides:
If it shall appear to the commissioner [Director] that an allocation factor determined pursuant to [N.J.S.A. 54:10A~6] does not properly reflect the activity, business, receipts, capital, entire net worth or entire net income of a taxpayer reasonably attributable to the State, he may adjust it by:
(a) excluding one or more of the factors therein;
(b) including one or more other factors, such as expenses, purchases, contract values (minus subcontract values);
(c) excluding one or more assets in computing entire net worth; or
(d) excluding one or more assets in computing an allocation percentage; or
(e) applying any other similar or different method calculated to effect a fair and proper allocation of the entire net income and the entire net worth reasonably attributable to the State.
Defendant adjusted the receipts fraction of the allocation factors by reflecting in the numerator of the fraction a portion of the receipts earned by plaintiff’s five broadcasting stations which reached a New Jersey audience. Defendant implemented this “audience factor” by multiplying the overall receipts generated by the five stations by a percentage representing the portion of each station’s listening or viewing audience that was *404 located in New Jersey. Thus, for example, in 1972, when WNEW-TV had total receipts of $22,682,000 and 29.1% of that station’s audience was in New Jersey, defendant attributed $6,600,462 (29.1% of $22,682,000) to New Jersey receipts. Similar calculations for the other stations resulted in total New Jersey receipts in 1972 of $10,039,489, and this total, when divided by plaintiff’s total 1972 receipts of $146,896,667, produced a revised receipts fraction for 1972 of 6.8343%.
Defendant similarly recomputed plaintiff’s reported receipts fractions for each of the years in issue, resulting in revised allocation factors as follows:
1972 1973 1974 1975
Property fraction 3.5083% 3.0654% 2.740 % 2.6544%
Payroll fraction .1389 .1251 .171 .0903
Receipts fraction 6.8343 6.6831 6.4722 6.5996
Allocation factor 3.4938% 3.2912% 3.1277% 3.1148%
Application of these new figures resulted in a deficiency assessment of $79,840.82.[3] In imposing the assessment, defendant did not adjust the denominator of the receipts fractions as reported by plaintiff, nor did he adjust the numerator or denominator of the property and payroll fractions. The adjustment was limited solely to the numerator of the receipts fraction in order to reflect a portion of the receipts of plaintiff’s stations that had a regular New Jersey audience within its primary coverage area.[4]
*405 Plaintiff does not dispute the amount of the assessment should this court uphold defendant’s actions. Plaintiff’s complaint is that defendant did not have the authority to adjust plaintiff’s tax liability, in the manner described, in the course of an audit of its tax returns, and that, in any event, the adoption of an audience factor for allocation factor purposes is unconstitutional. The issue before the court, therefore, is whether defendant’s use of a New Jersey audience factor to determine the amount of broadcasting receipts that should be reflected in the numerator of the receipts fraction of the three-factor allocation formula under N.J.S.A. 54:10A-6, for purposes of apportioning plaintiff’s net worth and net income tax bases under the Corporation Business Tax Act, was justified in the circumstances and history of this case.
Plaintiff’s principal contention is that defendant’s adoption of an audience factor to apportion its franchise tax liability constitutes administrative rule-making and is invalid for failure to comply with the notice and hearing requirements of the Administrative Procedure Act, N.J.S.A. 52:14B1 et seq. Plaintiff also maintains that the utilization of an audience factor to allocate the franchise tax is violative of the Due Process and Commerce Clauses of the Federal Constitution. Finally, plaintiff contends that subsection (e) of N.J.S.A. 54:10A-8, which purportedly authorized defendant to adopt the audience factor, is unconstitutionally vague and thus violative of the Due Process Clause.[5] Defendant disputes each of plaintiff’s contentions. As to the procedural argument, defendant’s response is three-fold. He maintains that both the allocation statute, N.J.S.A. 54:10A-6, and the statute permitting adjustment of the allocation factor, N.J.S.A. 54:10A-8, authorize the *406 use of an audience factor, and, in addition, that an explicit regulation was not required as a precondition to the levying of the assessment. Because the court is in agreement with plaintiff that defendant’s utilization of an audience factor constitutes an administrative rule which should have been treated accordingly under the Administrative Procedure Act (“APA”), the remaining issues raised need not be addressed.
The APA defines an “administrative rule” or “rule” to mean
... each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases. [N.J.S.A. 52:14B-2(e)]
The audience factor adopted by defendant in the course of his audit and assessment at issue herein, is, as was made clear at the trial of this matter, an agency statement that will apply generally to all similarly situated broadcasters, and which implements and interprets both law and policy. It does not, as defendant maintains, come within the exclusion for “agency decisions and findings in contested cases.” This is so because the audience factor employed by defendant represents neither a decision nor a finding of the Division of Taxation. All that can be properly characterized as a decision or finding is defendant’s ultimate conclusion as to plaintiff’s liability. The audience factor was, though not denominated as such, a rule of general applicability employed by defendant to permit him to make findings and render a decision in this case. Defendant’s “decision” in this matter, as that term must be used in the above statute, was that plaintiff owed additional franchise taxes for the tax years in question, and not that an audience factor is the proper tool with which to allocate such taxes for an out-of-state broadcaster such as plaintiff.
The promulgation of an administrative rule must be preceded by a notice and hearing as prescribed in N.J.S.A. 52:14B — 4:
(a) Prior to the adoption, amendment, or repeal of any rule, except as may be otherwise provided the agency shall:
*407 (1) Give at least 20 days’ notice of its intended action. The notice shall include a statement of either the terms or substance of the intended action or a description of the subjects and issues involved, and the time when, the place where, and the manner in which interested persons may present their views thereon. The notice shall be mailed to all persons who have made timely request of the agency for advance notice of its rule-making proceedings and in addition to other public notice required by law shall be published in the New Jersey Register;
(2) Afford all interested persons reasonable opportunity to submit data, views, or arguments, orally or in writing. The agency shall consider fully all written and oral submissions respecting the proposed rule.
(d) No rule hereafter adopted is valid unless adopted in substantial compliance with this section. A proceeding to contest any rule on the ground of noncompliance with the procedural requirements of this section must be commenced within 1 year from the effective date of the rule.
See, also, N.J.S.A. 52:14B-5. Concededly, these requirements were not met with regard to the use of an audience factor for purposes of the allocation of corporation business taxes.
After several decades the leading case in the area of administrative rule-making remains SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), which involved the refusal of the Securities and Exchange Commission to approve a plan of reorganization of a holding company registered under the Public Utility Holding Company Act of 1935. The company argued that the SEC was free only to promulgate a general rule outlawing future reorganization plans of the type involved, and that such a rule would have to be prospective in nature and have no application to the instant situation. The Supreme Court rejected the argument and upheld the Commission’s order. The court pronounced the following standards regarding administrative rulemaking:
Since the Commission, unlike a court, does have the ability to make new law prospectively through the exercise of its rule-making powers, it has less reason to rely upon ad hoc adjudication to formulate new standards of conduct within the framework of the Holding Company Act. The function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise . .. Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles *408 must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity, [at 202, 67 S.Ct. at 1580]
As examples, the court cited three situations in which an administrative agency cannot be expected to proceed by formal rule-making:
In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible to capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency, [at 202-203, 67 S.Ct. at 1580.]
See, also, NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); 2 Davis Administrative Law Treatise (2 ed. 1979), § 7:25.
This last excerpt from the Chenery opinion was relied upon by the Supreme Court in NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), in which it was held that the NLRB could proceed by adjudication rather than formal rule-making in determining whether certain buyers of Bell Aerospace’s products were “managerial employees” within the meaning of the National Labor Relations Act. The court cited with emphasis its Chenery language that a problem may be “so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule,” SEC v. Chenery Corp., supra at 202-203, 67 S.Ct. at 1580, and noted that there must be tens of thousands of concerns that employ buyers of the type that would be covered by a rule of general application, and that the duties of the buyers vary widely depending on the company or industry involved. In such circumstances the court concluded that “it is doubtful whether any generalized standard could be framed which would have more than marginal utility.” 416 U.S. at 294, 94 S.Ct. at 1771.
*409 The law in New Jersey is in accord with the general principles of the Chenery decision. In re Heller, 73 N.J. 292, 304-305, 374 A.2d 1191 (1977). In addition, the necessity for formal rule-making is tested by the clarity of the governing legislation.
As a general proposition, it is clear that if the language of a provision of a statute which an agency is empowered to administer and enforce leaves no room for substantial debate over its meaning, an administrative rule reiterating the inevitable statutory consequence would not by definition constitute either a statutory interpretation or a statutory implementation which must be expressed by a rule promulgated pursuant to the Administrative Procedure Act. Hence and tautologically, such a clear statutory provision is enforceable by the agency in accordance with its plain meaning without the necessity imposed by the Administrative Procedure Act for a prior rule promulgation.
[Equitable Life Mtg. and Realty Investors v. Taxation Div., 151 N.J.Super. 232, 240, 376 A.2d 966 (App.Div.1977), certif. den. 75 N.J. 535, 384 A.2d 514 (1977) ].
Ultimately, an agency’s decision to proceed by adjudication or by rule will depend upon all the relevant circumstances. In re Heller, supra , at 305, 374 A.2d 1191.
In Glaser v. Downes, 126 N.J.Super. 10, 312 A.2d 654 (App.Div.1973), certif. den. 64 N.J. 513, 317 A.2d 726 (1964), the court reviewed a notice sent by the Director of the Division of Taxation to all licensed retail motor fuels dealers in New Jersey. The notice declared that certain service stations “giveaways” were deemed illegal and set forth penalties to which dealers would be subject if they distributed any of the prohibited items. The notice was issued pursuant to a court order that permanently enjoined one particular dealer from issuing trading stamps in connection with the sale of motor fuel in excess of certain amounts.
Three oil companies, which were not parties to the litigation involving the individual dealer but who were affected by the Director’s state-wide notice, challenged its validity. Prior to the issuance of the notice they had all, through their retail dealers, used free gifts as a means of attracting patrons, and had done so in a manner consistent with the Director’s policy then in effect. With regard to the new order, the court noted that (1) the Director gave no notice of his intended issuance or mailing of that notification; (2) no opportunity was given to interested persons, prior to the sending out of the notice, to submit data, *410 views or arguments, orally or in writing; (3) no hearing was held with regard to the notice; (4) the Director gave no consideration to any data, views or arguments of interested persons respecting the notice prior to issuance, and (5) he never filed the notice with the Secretary of State.
The court found that the order was in effect a rule or regulation of universal application, and that there was “not so much as a shadow of compliance by the Director with the clearly stated requirements of the Administrative Procedure Act. What he did denied due process of law to the three companies here involved.” 126 N.J.Super. at 19, 312 A.2d 654. The court concluded that the action taken by the Director was invalid and set it aside.
In Boller Beverages, Inc. v. Davis, 38 N.J. 138, 183 A.2d 64 (1962), the court reviewed a determination of the Director of Alcoholic Beverage Control that certain containers and labels for corn whiskey were impermissible.[6] Petitioner, to whom the ruling applied, argued that it constituted an ad hoc administrative determination without adequate foundation and therefore an improper exercise of administrative power. Among the Director’s responses was the assertion that a provision in the Alcoholic Beverage Control Act authorized him to make “special rulings and findings.” Cf. N.J.S.A. 52:14B-2(e)(3).
The court did not question that the State could, by legislation or general rule, reasonably regulate bottles and labels either in furtherance of any of the general statutory purposes or pursuant to any specific statutory provision. It concluded, however, that there was no statutory provision which directly governed nor was there an implementing regulation which could ground the Director’s action. In striking the ruling the court reasoned as follows:
This was not a request by an interested party for an advance view of legality or an interpretation or construction of an existing statute or regulation of general *411 application. It amounts to ad hoc legislation and a simultaneous determination of violation thereof in a particular situation, on the Director’s own initiative and without a trial-type hearing, where prior thereto the alleged transgression had not been covered or proscribed by statute or regulation. See Mitchell v. Cavicchia, 29 N.J.Super. 11, 15 [101 A.2d 575] (App.Div.1953). Whatever are the outer limits of “special ruling or finding,” this is not within them, and for sound reason. As has already been pointed out, it is the antithesis of legislation to make law from case to case and after the fact. Where an administrative agent is given full rule-making power, he must in all fairness, bottom an alleged violation on general legislation before he may rule in a particular case. The general mandate, either statutory or administrative, must precede the specific violation. [38 N.J. at 155, 183 A.2d 64].
Based on the foregoing authority I am constrained to find that defendant’s adoption of an audience factor for purposes of apportioning plaintiff’s franchise tax liability, which, as previously noted, constitutes an administrative rule, is invalid for failure of defendant to comply with the rule-making requirements of the Administrative Procedure Act. Our courts have expressed a disinclination to approve agency procedures which are either intended to bypass the notice and hearing requirements of the act or which have that practical effect. Equitable Life Mtg. and Realty Investors v. Taxation Div., supra at 240, 376 A.2d 966. “Persons subject to regulation are entitled to something more than a general declaration of statutory purpose to guide their conduct before they are restricted or penalized by an agency for what it then decides was wrong from its hindsight conception of what the public interest requires in the particular situation.” Boiler Beverages, Inc., supra at 152, 183 A.2d 64.
The audience factor fits within none of the situations noted by the Supreme Court in Chenery in which ad hoc adjudication may be appropriate. The treatment of plaintiff’s television and radio station receipts was not a problem which the Division of Taxation could not reasonably have foreseen. Plaintiff itself had filed franchise tax returns presenting the same question of allocation for each of the 15 years immediately preceding the audit period at issue. For the same reason, this was not a situation in which the agency lacked “sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule.” SEC v. Chenery Corp., supra at 202, 67 S.Ct. at 1580. And it was not a problem that was “so *412 specialized and varying in nature as to be impossible of capture within the boundaries of a general rule.” Id. at 203, 67 S.Ct. at 1580. By defendant’s own admission the audience factor will be applied in the same manner to allocate the net worth and net income of all broadcasters whose transmission signals reach a New Jersey audience within their primary coverage area.
This is also not a situation in which “the language of a provision of a statute which an agency is empowered to administer and enforce leaves no room for substantial debate over its meaning,” Equitable Life Mtg. and Realty Investors, supra at 240, 376 A.2d 966, for which a formal rule is not required. There is nothing in the Corporation Business Tax Act that even remotely relates to an audience factor. The allocation provision, N.J.S.A. 54:10A-6, speaks only of property, payroll and receipts. Although “all .. . business receipts earned within the State” are to be reflected in the receipts fraction, N.J.S.A. 54:10A-6(B)(6), this language cannot encompass out-of-state sales that take into account a New Jersey audience. Nor can the allocation factor adjustment statute, N.J.S.A. 54:10A-8, which permits the Director to use any method calculated to achieve a fair allocation, support the use of an audience factor in the absence of an administrative rule, properly adopted. An audience factor is a novel concept unrelated to any of the suggested methods of adjustment contained in the statute, such as excluding one or more of the factors such as expenses, purchases or contract values. Without deciding the exact parameters of the types of adjustment the statute would allow in an ad hoc adjudication, it appears evident that the audience factor adopted here is outside the reach and intent of the statute.[7] If the audience factor *413 were upheld, then it is difficult to imagine any adjustment that would fall without the statute. Such a result would make the notice and hearing requirements of the Administrative Procedure Act a nullity as far as allocation factor adjustments were concerned, a result which finds no support in the franchise tax legislation.
The cases in which ad hoc administrative adjudications have been upheld are distinguishable from the present case. In Mitchell v. Cavicchia, 29 N.J.Super. 11, 101 A.2d 575 (App.Div.1953), the Division of Alcoholic Beverage Control charged that a cafe owner hindered and delayed a Division investigation into the conduct of the Cafe’s business, in violation of statute. The owner contended that the Division had to promulgate rules under the statute as to what sort of acts constituted impermissible hindrance or delay. The court rejected this contention because the statute was sufficiently precise so as not to require regulations to spell out its terms. In Merry Heart Nursing, etc., Home, Inc. v. Dougherty, 131 N.J.Super. 412, 330 A.2d 370 (App.Div.1974), the court held that the New Jersey Health Care Administration Board could consider updated information of a merely statistical nature pursuant to statutory direction, at a remanded hearing without first pursuing formal rule amendment procedures.
In R. H. Macy & Co., Inc., v. Taxation Div. Director, 77 N.J.Super. 155, 185 A.2d 682 (App.Div.1962), aff’d o.b. 41 N.J. 3, 194 A.2d 457 (1963), upon which defendant relies, the court upheld the Director’s adjustment of the method of valuing the inventory account reflected on Macy’s franchise tax return even though it was not done pursuant to general regulation. However, neither of the two reasons offered by the court would compel a similar ruling here. The court determined that a general rule was not required because it was not apparent that a rule of unvarying application would be appropriate in all such *414 cases, and because an adequate legislative standard existed for administrative guidance. As noted above, neither of those situations is present here.
This court’s ruling should not be construed to mean that an audience factor is not an appropriate manner in which to allocate the net worth and net income of this taxpayer. The court does not reach that question. However, the use of an audience factor was improper in the course of defendant’s adjudication of plaintiff’s liability in this case.
The action of the Director of the Division of Taxation is set aside. Judgment will be entered in favor of plaintiff vacating the assessment.

The property was owned by plaintiff but was used and operated by the radio stations.

Plaintiff had filed returns for each year commencing with the 1957 tax year. In each year from 1957 to 1971, inclusive, defendant accepted plaintiffs returns without material adjustment.

This amount differs from that reported in defendant’s final determination letter, which had been based on inaccurate information. The tax has not been paid by plaintiff. Interest is accruing at the minimum statutory rate.

The record reveals that defendant’s determination to use an audience factor for allocation purposes will apply to ail out-of-state broadcasters whose transmission signals reach a New Jersey audience. Although the precise manner in which this policy has been or will be made public is not apparent, it is clear that no notice of the adoption of such a policy was provided to plaintiff or any other broadcasters prior to the conclusion of this particular audit.

Plaintiff also notes its reliance on defendant’s acceptance of each of its returns filed during the 15 years prior to the current appeal period, in which plaintiff utilized the three-factor formula prescribed by N.J.S.A 54:10A 6. However, plaintiff offers no legal authority for an estoppel against defendant in these circumstances. See New Jersey Turnpike Auth. v. Washington Tp., 137 N.J.Super. 543, 552, 350 A.2d 69 (App.Div.1975), aff’d o.b. 73 N.J. 180, 373 A.2d 652 (1977).

The fact that the case was decided prior to the enactment of the Administrative Procedure Act does not detract from its applicability to the issues herein.

Defendant cites three out-of-state cases in which adjustments of franchise tax returns pursuant to statutes similar in design to N.J.S.A. 54:10A-8 were upheld. See Covington Fabrics Corp. v. South Carolina Tax Comm’n, 264 S.C. 59, 212 S.E.2d 574 (1975); Hellertown Mfg. Co. v. Pennsylvania, 480 Pa. 358, 390 A.2d 732 (1978); Kennecott Copper Corp. v. State Tax Comm’n. of Utah, 27 Utah 2d 119, 493 P.2d 632 (1973), app.dism. 409 U.S. 973, 93 S.Ct. 323, 34 L.Ed.2d 237 (1972). These cases, however, involved modifications of the traditional three-factor formula in a manner within the contemplation of *413 the adjustment statutes. None involved an adjustment in the nature of the audience factor adopted by defendant in this case.