JOSEPH H. REINFELD, INC., MAJESTIC WINE & SPIRITS, INC., FLAGSTAFF LIQUOR CO., AND BANNER LIQUOR CO., ALL NEW JERSEY CORPORATIONS, RESPONDENTS, v. SCHIEFFELIN & CO., A NEW YORK CORPORATION, M–H U.S.A. CORP., D/B/A SCHIEFFELIN & CO., A DELAWARE CORPORATION, AND MOET-HENNESSY U.S. CORP., A DELAWARE CORPORATION, APPELLANTS.

THE JAYDOR CORPORATION, T/A J & J DISTRIBUTING CO., RESPONDENT, v. SCHIEFFELIN & CO., MOET-HENNESSY, S.A., AND M–H U.S.A. CORP., APPELLANTS.

F & A DISTRIBUTING CO., GILLHAUS BEVERAGE CO., INC., AND MERCHANTS WINE & LIQUOR CO., RESPONDENTS, v. M–H U.S.A. CORP., SCHIEFFELIN & CO., AND FEDWAY ASSOCIATES, INC., APPELLANTS.

REITMAN INDUSTRIES, RESPONDENT, v. SCHIEFFELIN & CO., MOET-HENNESSY, S.A., AND M–H U.S.A. CORP., APPELLANTS.

AMERICAN B.D. COMPANY, RESPONDENT, v. SCHIEFFELIN & CO., MOET-HENNESSY, AND U.S.A. CORP., APPELLANTS.

Argued April 19, 1983—Decided October 6, 1983.

402

*Clyde A. Szuch* argued the cause for appellants Schieffelin & Co., etc., et al. (*Pitney, Hardin, Kipp & Szuch*, attorneys; *Clyde A. Szuch, Elizabeth M. Callaghan, Stuart M. Feinblatt* and *Murray J. Laulicht*, on the briefs).

*Theodore V. Wells, Jr.*, argued the cause for respondent Reitman Industries (*Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan*, attorneys).

*Edward G. D'Alessandro* argued the cause for respondents F & A Distributing Co., et al. (*D'Alessandro, Sussman, Jacovino & Mahoney*, attorneys).

*Joseph M. Jacobs* argued the cause for respondent The Jaydor Corporation, etc. (*Mr. Jacobs*, attorney; *A. Richard Ross*, on the brief).

*Sidney Berg* argued the cause for respondents Joseph H. Reinfeld, Inc., et al.

*Barbara A. Harned*, Deputy Attorney General, argued the cause for respondent Division of Alcoholic Beverage Control (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney;

*James J. Ciancia,* Assistant Attorney General, and *Andrea M. Silkowitz,* Deputy Attorney General, of counsel).

*Clive S. Cummis* submitted a brief on behalf of appellants Fedway Associates, Inc. (*Sills, Beck, Cummis, Zuckerman, Radin & Tischman,* attorneys; *Clive S. Cummis, Robert A. Baime* and *Alfred J. Luciani,* of counsel; *Lewis B. Cohn,* on the brief).

*Paul D. Kreisinger* submitted a letter in lieu of brief on behalf of respondent American B.D. Company (*Jeffer, Hopkinson & Vogel,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

The Director of the Division of Alcoholic Beverage Control (Director and ABC) determined that Schieffelin & Co., a liquor importer, violated *N.J.S.A.* 33:1–93.6, which prohibits discrimination in the sale of most nationally advertised liquors by importers to authorized wholesalers. In addition to challenging that determination, appellants claim that *N.J.S.A.* 33:1–93.6 deprives them of due process and equal protection and mandates a group boycott in violation of the Sherman Act, 15 *U.S.C.A.* § 1. We uphold the Director's finding of discrimination and conclude that appellants' other claims lack merit.

I

Moet-Hennessy, S.A. ("Moet") is a French distiller of alcoholic beverages. For some time before the events giving rise to these proceedings, Moet's products were distributed in the United States through an exclusive importer, Schieffelin & Co., a New York corporation (Schieffelin, N.Y.). Schieffelin, N.Y. in turn authorized several wholesalers, including the respondents herein, to distribute the beverages in New Jersey.

In the fall of 1980 Moet began a series of maneuvers aimed at reducing its distribution network in the United States. Moet's goal was to import its product through a subsidiary and have the subsidiary distribute it through a single wholesaler. On Sep-

tember 15, 1980 Moet and a wholly-owned subsidiary, Moet-Hennessy Newco Corporation, entered into an agreement with Schieffelin, N.Y., whereby Moet-Hennessy Newco Corp. would merge into Schieffelin, N.Y., the latter retaining its name and business. The parties consummated the merger on January 6, 1981, with Moet paying $48 million for all the outstanding Schieffelin, N.Y. common stock. The merger agreement noted that 18 states, among them New Jersey, had regulations forbidding Schieffelin, N.Y. from cancelling its distribution agreements. The agreement's list of wholesalers protected from cancellation included the respondents in this case.

On December 29, 1980 M–H U.S.A. corporation, a wholly-owned indirect subsidiary of Moet, was incorporated in Delaware. Moet had intended, apparently for tax reasons, to liquidate Schieffelin, N.Y. and transfer its assets to M–H U.S.A. on January 6, 1981, the date of the above-mentioned merger, but federal licensing delayed this. It was not until July 1, 1981 that M–H U.S.A. absorbed Schieffelin, N.Y. The new corporation called itself Schieffelin (Delaware)—hereafter referred to as Schieffelin—and retained the officers, directors and salespeople of the "old" Schieffelin, N.Y.

Even after Moet acquired Schieffelin, N.Y., the latter continued to sell to respondents. Schieffelin, N.Y. did not surrender its New Jersey liquor license or the solicitor's permits for its salespersons until June 26, 1981 and July 1, 1981, respectively. Meanwhile, on May 29, 1981, Schieffelin, N.Y. sent letters informing the respondents that their contracts with Schieffelin, N.Y. would be cancelled as of July 1, 1981. Thereafter a bidding match ensued between at least two wholesalers for the favor of Schieffelin, spurred in part by Schieffelin's comment that it would decide who would "be on their team" based on "what [the respondents] could do for them." Fedway Associates, Inc. (Fedway), an authorized wholesaler, apparently could do the most for Schieffelin and Moet, for on June 26, Fedway filed "brand registrations" with the ABC, pursuant to *N.J.A.C.* 13:2–33.1. By this means Fedway sought to designate itself and its subsidi-

aries and affiliates as the sole authorized wholesale distributors of Moet products in New Jersey. An authorization letter from M–H U.S.A. accompanied those registrations.

Respondents filed petitions with the Director of the ABC, pursuant to *N.J.S.A.* 33:1–93.7, alleging discrimination against them by Schieffelin. It was stipulated that the products involved were nationally advertised brands, that Schieffelin, N.Y. had authorized the respondents to distribute Moet products in New Jersey, and that the respondents could pay for and had not disparaged those products. Schieffelin's evidence consisted solely of an affidavit of its vice-president that set out the steps Moet had taken to overhaul the distribution network; it did not submit any proof, however, of the effect those steps had on Schieffelin's or Moet's business or on competition for liquor in this state. Schieffelin also claimed that since it then distributed its products in New Jersey through the so-called "brand registration" method, see *N.J.A.C.* 13:2–33.1, Schieffelin was no longer under the jurisdiction of the ABC and its termination of the respondent wholesalers was not prohibited by the anti-discrimination statute.

The Director concluded that Schieffelin had violated the anti-discrimination statute. The loss of Schieffelin's products, the Director found, would seriously harm the respondent wholesalers and would cause a "significant competitive disruption." His order prohibited all New Jersey wholesalers from buying and Fedway from selling any alcoholic beverage (except for malt liquors, which are not covered by the statute) from Moet or Schieffelin. Schieffelin could apply to vacate the order at any time by showing that it had resumed sales to the respondents. The Appellate Division affirmed substantially on the basis of the Director's opinion. We granted certification, 91 *N.J.* 563 (1982), and now affirm.

## II

The anti-discrimination statute, *N.J.S.A.* 33:1–93.6, reads:

There shall be no discrimination in the sale of any nationally advertised brand of alcoholic beverage other than malt alcoholic beverage, by importers, blenders, distillers, rectifiers and wineries, to duly licensed wholesalers of alcoholic beverages who are authorized by such importers, blenders, distillers, rectifiers and wineries to sell such nationally advertised brand in New Jersey.

The statement accompanying that law explained, "The purpose of this bill is to ensure an equitable basis for competition between supplier franchised wholesalers of alcoholic beverages in New Jersey." In examining the predecessor to the current law, this Court, in *Canada Dry Ginger Ale, Inc. v. F. & A. Distributing Co.*, 28 *N.J.* 444 (1958), noted a second purpose of the legislation:

The ultimate goal sought to be attained by the statute in question, as in the entire scheme of liquor legislation, is the protection of the public through the promotion of temperance and elimination of the racketeer and bootlegger. *N.J.S.A.* 33:1–3. In order to accomplish this purpose the statute seeks to achieve as far as necessary the independence of wholesalers from distillers. A wholesaler dependent upon a distiller for a supply of sought-after merchandise might be tempted to comply with the non-legitimate desires of the distiller if the latter were free to discontinue the supply at will. For the purpose of strengthening the wholesaler's resistance if confronted with a distiller's wish to over-stimulate sales and thus negate the public policy in favor of temperance or a desire to engage in other prohibited acts, *e.g.*, tie-in sales, the statute seeks to prevent the distiller from arbitrarily closing the source of supply to a wholesaler. [*Id.* at 455.]

If, before its transformation into Schieffelin (Delaware) and before its acquisition by Moet, Schieffelin, N.Y. had terminated the respondent wholesalers while retaining Fedway, it clearly would have violated the anti-discrimination statute. *See American B.D. Co. v. House of Seagrams, Inc.*, 107 *N.J.Super.* 264 (App.Div.1969), *aff'd o.b.*, 56 *N.J.* 164 (1970), in which the court decided that a distiller violated the anti-discrimination law when, for admittedly legitimate business reasons, it terminated all its authorized wholesalers and attempted to distribute the liquor itself. However, the metamorphosis of Schieffelin, N.Y. into Schieffelin (Delaware) complicates this case.

Schieffelin asserts that Schieffelin, N.Y. terminated all its wholesalers and went out of business; that "new" Schieffelin authorized only Fedway to sell Moet products; and that *N.J.S.A.* 33:1–93.6, which protects only authorized wholesalers, cannot

protect the respondents. This argument cannot stand. The "old" and "new" Schieffelin companies had the same directors, officers and salespeople. Only the state of incorporation changed. Were we to allow Schieffelin to avoid the anti-discrimination statute through such corporate legerdemain, we would plainly frustrate the statute's purpose.

Schieffelin also argues that Moet, in acquiring a supplier to the New Jersey market, should not be required to adhere to that supplier's distribution system. We note that Moet and Schieffelin continued to use the prior distribution system for six months following Moet's acquisition of Schieffelin. Additionally, Moet acquired Schieffelin, N.Y. with full knowledge of the existing distributorship agreements and of the prohibition against terminating them without cause, but violated that prohibition anyway. The anti-discrimination statute is to be liberally construed to achieve its objectives. *Canada Dry, supra,* 28 *N.J.* at 455. It would frustrate the purpose of the statute to permit Moet to terminate the respondents without cause. The Director found that the discrimination against respondents in favor of Fedway would cause a significant competitive disruption, which the statute, whose purposes include the ensuring of competitive stability, seeks to avoid. *See Heir v. Degnan,* 82 *N.J.* 109, 114 (1980). Moreover, Schieffelin tried to pit the respondents against each other to see which could do more for Schieffelin, reminiscent of the practice this Court censured in *Canada Dry, supra.* However inconvenient the statute might be to Moet's and Schieffelin's trade, even "bona fide business policy in the field of liquor traffic must yield to the policy of the State." *Canada Dry, supra,* 28 *N.J.* at 456. Were we to permit Moet and Schieffelin to circumvent the statute in this instance, we would encourage the very evils the act was designed to prevent.

We are not deciding that the distiller invariably violates the anti-discrimination statute when it takes control of its distribution network. This case does not involve any deficiency in the petitioners as wholesalers. The circumstances of this case relate

to the continuation of the distribution chain of nationally advertised brands of alcoholic beverages through only one of a group of previously authorized wholesalers.

Schieffelin attempts to escape the force and effect of the anti-discrimination statute by resort to *N.J.A.C.* 13:2–33.1, contending that that regulation gives a supplier the right to limit its sales to those wholesalers whom it designates as "brand registrants." *N.J.A.C.* 13:2–33.1(a) provides that every licensee who desires to sell, deliver, purchase or receive alcoholic beverages must file with the Director a schedule listing the brand name of the beverage, its nature and type, its age, its proof, the number of standard unit containers per standard case, the capacity of each unit container, and the names of all New Jersey licensees acknowledged by the filer to be an authorized distributor of the product at wholesale. *N.J.A.C.* 13:2–33.1(b) reads:

The schedule shall be filed by:

1. The manufacturer or wholesaler who owns such brand; or

2. A wholesaler selling such brand who is appointed as exclusive agent by the brand owner for the purpose of filing such schedule; or

3. Any wholesaler with the approval of the director in the event that the owner of such brand does not file or is unable to file a schedule or designate an agent for such purposes; or

4. In the case of private label brands, by the manufacturer or wholesaler supplying such private label brand to the retailer or by any wholesaler having authority, in writing, from the retailer owning such private label brand, except where the alcoholic beverages are imported by the retailer under a special permit issued by the director, in which case the retailer shall file the schedule and the labels.

On June 26, 1981 M–H U.S.A. authorized Fedway, but not the other wholesalers, to file, pursuant to *N.J.A.C.* 13:2–33.1, product schedules for the alcoholic beverages involved in this suit. Schieffelin contends that such "brand registration" permitted Schieffelin to deal exclusively with Fedway. In effect, Schieffelin argues that a party may side-step the anti-discrimination statute and the regulations promulgated thereunder by filing a brand registration.

We need pause only briefly on that argument. The fact that a supplier chooses to continue its sales to a single wholesaler

whom it calls a "brand registrant" does not alter the fact that the anti-discrimination statute is violated if at the same time the supplier refuses to sell to other wholesalers who had been handling the brand. *N.J.A.C.* 13:2–33.1 was not promulgated to allow circumvention of the anti-discrimination statute; the true purpose of the registration requirement was expressed by the Director:

> The regulations of the Division of Alcoholic Beverage Control are an extension of the exercise of the full plenary powers of the State of New Jersey to regulate the sale and distribution of alcoholic beverages within its boundaries pursuant to the Twenty-First Amendment. In that regard, Sub-chapters 25 and 33 of the regulations are designed to assist the State in identifying the distribution network of alcoholic beverages to insure tax integrity (See, *N.J.A.C.* 13:2–24.1, 14.6, 24.8, 25.1, et seq., 33.1 et seq., 39.1 and 39.2). The State simply wishes to know what products are being distributed within the State and by whom. The information is of great significance under circumstances such as are now present here, where a State has recently repealed a system of industry price maintenance and permitted a more pro-competitive market. [*In the Matter of the Brand Registration of Certain "Western" Malt Beverages,* A.B.C. Bulletin 2391, item 4, March 4, 1981.]

Clearly, *N.J.A.C.* 13:2–33.1 was not intended to provide a legitimate means of avoiding the anti-discrimination statute, especially since the competition that the anti-discrimination statute was intended to protect would wither should Schieffelin be permitted to use the brand registration to discontinue all but one of its wholesalers.

### III

Appellants assert that the Director's decision violated Moet's right to equal protection by establishing "irrational and arbitrary distinctions" between two categories of corporations commencing to sell liquor in New Jersey: (1) those corporations that purchase the assets of prior suppliers to the New Jersey market and (2) those that do not. One approach to the evaluation of that argument starts with the proposition that economic legislation that does not employ a suspect classification or impinge on fundamental rights will withstand an equal protection challenge if rationally related to a legitimate government purpose. Moreover, such legislation carries with it a presumption

of rationality that can be overcome only by clear proof to the contrary. *Hodel v. Indiana,* 452 *U.S.* 314, 331–32, 101 *S.Ct.* 2376, 2386–87, 69 *L.Ed.2d* 40, 55 (1981). Liquor dealers are not a suspect class, nor is liquor distribution a fundamental right. This Court has recognized that "there is no common, inherent, ˄ natural or constitutional right to engage in the business of selling liquor." *Canada Dry, supra,* 28 *N.J.* at 454, quoting *Eskridge v. Division of Alcoholic Beverage Control,* 30 *N.J.Super.* 472, 474 (App.Div.1954). Thus, the "rational basis" standard applies.

■ Moreover, the Legislature's "practically limitless" power to regulate the sale of intoxicating beverages, *Affiliated Distillers Brands Corp. v. Sills,* 56 *N.J.* 251, 256 (1970), accentuates the normal deference afforded by the "rational basis" test. Although that power was broad even before the passage of the Twenty-first Amendment, *Wisconsin v. Constantineau,* 400 *U.S.* 433, 436, 91 *S.Ct.* 507, 509, 27 *L.Ed.2d* 515, 518 (1971), that Amendment gave the states plenary power to regulate the sale and distribution of liquor, and it permits classifications that relate to that regulatory function. *See, e.g., State Bd. of Equalization v. Young's Market Co.,* 299 *U.S.* 59, 62–64, 57 *S.Ct.* 77, 78–79, 81 *L.Ed.* 38, 41–42 (1936).

■ Viewed in this light, the equal protection claim fails. First, assuming that Schieffelin correctly identifies the classification as those who buy the assets of prior distributors and those who do not, the legislature could have decided that wholesalers authorized by the former supplier must continue to be authorized even after another entity has bought the supplier's assets. This would promote temperance by freeing from any illegitimate demands that suppliers might make those wholesalers who have become dependent on a supplier. It would also stabilize trade by requiring the new owner to renew the authorizations of all previously authorized wholesalers. At the same time, it is rational to allow new entrants who do not buy the assets of a previous supplier to select their wholesalers. The initial selec-

tion of wholesalers does not involve the same type of discrimination that could exist after a wholesale distributive chain has been established. These same considerations serve to satisfy the alternative "balancing" or "means focused" to equal protection since approved by this Court in *Collingswood v. Ringgold,* 66 *N.J.* 350, 370 (1975), *appeal dismissed,* 426 *U.S.* 901, 96 *S.Ct.* 220, 48 *L.Ed.2d* 826 (1976); *Taxpayers Ass'n v. Weymouth Township,* 80 *N.J.* 6, 38 n. 15 (1976), *appeal dismissed,* 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.2d* 373 (1977); and *Right to Choose v. Byrne,* 91 *N.J.* 287, 308–09 (1982).

Schieffelin's due process claim founders amidst these same considerations. Substantive due process requires "only that a law shall not be unreasonable, arbitrary or capricious, and that the means selected shall bear a rational relation to the legislative object sought to be obtained." *Robson v. Rodriquez,* 26 *N.J.* 517, 522 (1958), *quoted in Piscataway Tp. Bd. of Educ. v. Caffiero,* 86 *N.J.* 308, 318 (1981). Here, as we have demonstrated, that test is satisfied. The application of the statute bears a rational relationship to the goals of promoting temperance and competition.

### IV

Appellants contend that the statutory remedy imposed by the Director amounts to a group boycott in violation of the Sherman Act, 15 *U.S.C.A.* § 1, inasmuch as his Order brings about the same effect as would occur if a trade association of wholesalers agreed to boycott Schieffelin unless it consented to do business with all of them. Schieffelin notes that an express agreement to violate the Sherman Act need not be shown if it can be demonstrated that the parties participated in the scheme knowing that group action is contemplated. *See Interstate Circuit, Inc. v. United States,* 306 *U.S.* 208, 226, 59 *S.Ct.* 467, 474, 83 *L.Ed.* 610, 620 (1939).

In *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 *U.S.* 207, 212, 79 *S.Ct.* 705, 709, 3 *L.Ed.2d* 741, 744 (1959), the Supreme Court

defined group boycotts as "concerted refusals by traders to deal with other traders." Group boycotts include group refusals to buy, *Eastern States Retail Lumber Dealers Ass'n v. United States,* 234 *U.S.* 600, 34 *S.Ct.* 951, 58 *L.Ed.* 1490 (1914), and group refusals to sell, *Klor's, supra,* 359 *U.S.* at 207, 79 *S.Ct.* at 705, 3 *L.Ed.2d* at 741. But here the respondents have merely followed the Director's Order, and they raise the obvious question whether they can be said to have violated any law without having committed a voluntary act. The Supreme Court has avoided the question of whether state direction or authorization of a practice is to be considered in defining a boycott, or whether the possibility of state action goes to the defense and not to the initial lawfulness of respondents' conduct. We need not decide which is the sounder approach, however, for under either analysis Schieffelin's claim fails.

■ Assuming for purposes of discussion that there can be a boycott even when the parties are simply following a state regulation, the threshold question becomes whether the Director's Order prohibiting the respondent wholesalers from dealing with Schieffelin effected an unlawful group boycott. The prevailing standard for analyzing an allegedly anti-competitive practice is the "rule of reason." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 *U.S.* 36, 49, 97 *S.Ct.* 2549, 2557, 53 *L.Ed.2d* 568, 580 (1977); *Pomanowski v. Monmouth County Bd. of Realtors,* 89 *N.J.* 306, 315 (1982). Under this approach the fact finder looks to all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint. "[T]he inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *National Soc. of Professional Eng'rs v. United States,* 435 *U.S.* 679, 691, 98 *S.Ct.* 1355, 1365, 55 *L.Ed.2d* 637, 650 (1978). *See also State v. Lawn King, Inc.,* 84 *N.J.* 179, 194 (1980).

■ Respondents urge that the Director's Order promotes competition. They argue that the Order should be viewed as a

straightforward prohibition against doing business in this state unless Schieffelin complies with New Jersey's laws, specifically the anti-discrimination statute. There is a parallel to this argument in the professional licensing context: *N.J.S.A.* 45:1–21 h allows the relevant board to revoke a certificate, license, or registration where the holder "[h]as violated or failed to comply with the provisions of any act or regulation administered by the board." *See generally In re Polk License Revocation*, 90 *N.J.* 550 (1982) (dealing with other portions of *N.J.S.A.* 45:1–21). Although such a revocation could be characterized as a group boycott (the state orders consumers not to deal with the offender), there is no question that such a penalty is lawful.

The sanction imposed by the anti-discrimination statute is less severe than a license revocation, since Schieffelin may end it at any time by selling to the respondents. Furthermore, the anti-discrimination statute is designed to prevent curtailment of competition by barring selective termination of wholesalers. In effect, that statute encourages competition by punishing anti-competitive behavior. It requires too great a strain to accept Schieffelin's argument that the respondents are engaging in a forbidden group boycott.

Appellants, on the other hand, have fashioned no effective countervailing argument that the Director's Order ultimately suppresses competition. The immediate effect of the Order concededly prevents Moet and Schieffelin from selling to Fedway despite their mutual desire to deal; but the conclusion is inescapable that the Director sought merely to protect and foster competition among authorized wholesalers in furtherance of this state's clearly established goals of temperance and free-handed dealing within the liquor industry. We are convinced that the Director's homeopathic doses of restrictions will restore competitive balance to that segment of the industry in which the respondent wholesalers labor.

Appellants argue that application of the "rule of reason" should be foreclosed on the ground that the restraint is per se

illegal under the Sherman Act. We disagree. The *Continental* Court noted that

[p]er se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive. As the Court explained in *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 2 L.Ed.2d 545, 78 S.Ct. 514 (1958), "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." [433 *U.S.* at 49–50, 97 *S.Ct.* at 2557, 53 *L.Ed.2d* at 580.]

The Director's order was neither pernicious nor lacking in redeeming virtues. The restraints ordered by him were not related to price, nor were they directed at any competitor of the respondents. The restraint was vertical, aimed at the supplier. In *Continental,* the Court stated that such vertical non-price restraints often have redeeming virtues and should be analyzed under the "rule of reason" standard. 433 *U.S.* at 58–59, 97 *S.Ct.* at 2561–2562, 53 *L.Ed.2d* at 585. Although *Continental* dealt with location restrictions in franchise agreements, we see no reason to view the restraints involved in this case as per se violations, especially since the pro-competition animus of the statute exemplifies the "redeeming virtues" extolled by the *Continental* Court. Although it cautioned that not all vertical restrictions would be studied under the rule of reason, the Court made it clear that departure from that standard "must be based upon demonstrable economic effect." *Id.* We have no evidence of any demonstrable economic effect before us and perceive no basis upon which to declare the restraints per se illegal.

Respondents also assert that the state action doctrine of *Parker v. Brown,* 317 *U.S.* 341, 63 *S.Ct.* 307, 87 *L.Ed.* 315 (1943), exempts them from the Sherman Act. That doctrine holds that the Sherman Act does not prohibit state-imposed restraints on competition. Although not necessary to our disposition, we note that the *Parker* doctrine would certainly apply to this case in light of the active role the state took in prohibiting the respondents from buying Schieffelin's products. In *Parker,* a California statute authorized a state Agricultural Prorate Advisory

Commission, upon a petition from raisin producers in a particular zone, to appoint, from a list of nominees submitted by those producers, a committee of private persons who would formulate a proration marketing plan for raisins from that zone. The plan would become effective upon approval by the Commission and the producers in that zone, and the failure of any producer to observe it thereafter would be a misdemeanor. The prorate program was adopted in order to protect the state's raisin industry.

Brown, a raisin producer, challenged this scheme, asserting a violation of the Sherman Act. The Court assumed that the arrangement would be illegal if organized by and among private parties. 317 *U.S.* at 350, 63 *S.Ct.* at 313, 87 *L.Ed.* at 325. It continued:

> But it is plain that the prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority from the legislative command of the state and was not intended to operate or become effective without that command.
>
> \* \* \* \* \* \* \* \*
>
> [I]t is the state, acting through the Commission, which adopts the program and which enforces it with penal sanctions, in the execution of a governmental policy. The prerequisite approval of the program upon referendum by a prescribed number of producers is not the imposition by them of their will upon the minority by force of agreement or combination which the Sherman Act prohibits. The state itself exercised its legislative authority in making the regulation and in prescribing the conditions of its application. [*Id.* at 350, 352, 63 *S.Ct.* at 313, 314, 87 *L.Ed.* at 325, 326.]

Since the Sherman Act did not apply to state action such as this, but only to private anti-competitive action, it could not be used to strike down the prorate program.

The Supreme Court recently analyzed a *Parker* doctrine claim in a case involving the liquor industry, *California Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 *U.S.* 97, 100 *S.Ct.* 937, 63 *L.Ed.*2d 233 (1980), and identified two criteria for antitrust immunity under *Parker.* "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be "actively supervised" by the state itself." *Midcal,* 445 *U.S.* at 105, 100 *S.Ct.* at 943, 63 *L.Ed.*

2d at 243, quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 *U.S.* 389, 410, 98 *S.Ct.* 1123, 1135, 55 *L.Ed.2d* 364, 381 (1978). The California statute at issue required all wine producers, wholesalers and rectifiers to file fair trade contracts or price schedules with the state. A single fair trade contract or schedule bound all transactions taking place in a given trading area, violation of which would lead to penalties. Significantly, the State had "no direct control over wine prices, and it [did] not review the reasonableness of the prices set by wine dealers." *Id.* at 100, 100 *S.Ct.* at 940, 63 *L.Ed.2d* at 239. The scheme passed the first prong of the *Parker* test because "[t]he legislative policy [was] forthrightly stated and clear in its purpose to permit resale price maintenance," 445 *U.S.* at 105, 100 *S.Ct.* at 943, 63 *L.Ed.2d* at 243, but failed the second prong because the state gave all the responsibility for administering the program to private parties.

By contrast, in this case the State ordered the wholesalers not to deal with Schieffelin. It did not merely acquiesce in a pre-existing plan to boycott the importer. The Director imposed his order only after a lengthy proceeding at which both sides could submit evidence. On its face the Director's order meets the "active supervision" test. The appellants concede that it also satisfies the "clearly articulated and affirmatively expressed" test. Accordingly, even if the restraints imposed by the Director amounted to an illegal boycott, the *Parker* doctrine would save this case from an antitrust challenge.

In light of our holding it is unnecessary to consider whether the statute would be saved under the Twenty-first Amendment.

V

Finally, we turn to Fedway's claims. In addition to echoing Schieffelin's challenges to the anti-discrimination statute, Fedway questions the authority of the Director to issue a special ruling forbidding Fedway from selling, until further notice from the Director, any alcoholic beverage that it had

purchased subsequent to July 23, 1981 from Moet or Schieffelin. The Director issued that order pursuant to *N.J.S.A.* 33:1–39, which enables him to "make such general rules and regulations and such special rulings and findings as may be necessary for the proper regulation and control of the * * * distribution of alcoholic beverages * * *." Fedway contends that nothing in the anti-discrimination statute or the regulations gave the Director a mandate to issue this special ruling and that therefore the Director exceeded his powers.

Fedway supports its position by reference to *Boller Beverages, Inc. v. Davis,* 38 *N.J.* 138 (1962). In that case a wholesaler began to market a corn whiskey called "Georgia Moon" in Mason jars, the traditional containers for illegal whiskey. The Director, without holding any formal proceeding or trial, informed the wholesaler that he would not allow Mason jars to be used. This Court recognized that the nature of the administrative process should allow agencies to respond, pursuant to *N.J. S.A.* 33:1–39, to requests for advance views of the propriety of proposed actions, but found that the Director's action did not fall within that category. Rather, it amounted to "*ad hoc* legislation and a simultaneous determination of violation thereof in a particular situation, on the Director's own initiative and without a trial-type hearing * * *." 38 *N.J.* at 155.

Unlike the parties in *Boller,* Fedway was afforded a trial-type hearing prior to the Director's special ruling. This distinction is significant. In *State v. Owens-Corning Fiberglas Corp.,* 100 *N.J.Super.* 366, 386–87 (App.Div.1968), *aff'd o.b.,* 53 *N.J.* 248 (1969), the court upheld administrative action that followed a full hearing and distinguished *Boller* on the grounds that in that case the Director had acted without a hearing of any kind.

The question thus becomes whether the Director had the power to issue his special ruling after having afforded the parties a full hearing. We hold that he did. The Director was empowered by *N.J.S.A.* 33:1–39 to make "such special rulings * * * as may be necessary" to regulate the liquor industry. In

this case he found that the purpose of his order would be frustrated if Fedway could continue to sell Schieffelin products that it had on hand. The Director may have feared that Fedway had stockpiled Schieffelin products in order to sell them during the appeal process while respondents had no such supplies. The special ruling was manifestly necessary to the success of the anti-discrimination statute. *See In re Schedule of Rates for Barnert Memorial Hosp.,* 92 *N.J.* 31, 39 (1983), in which we noted that "[a]n agency charged with implementation of a statutory program to assure health and safety of the public must have the ability to achieve the statutory purpose, even when there is no express grant of power." That philosophy applies pertinaciously to the liquor industry, whose exceptional nature has long subjected it to severe restrictions. *See Ziffrin, Inc. v. Reeves,* 308 *U.S.* 132, 138, 60 *S.Ct.* 163, 167, 84 *L.Ed.* 128, 135 (1939); *cf. X–L Liquors v. Taylor,* 17 *N.J.* 444, 449 (1955) (Director may adopt regulations pertaining to the liquor industry even when they deal with subjects not specifically mentioned in the Alcoholic Beverage Law).

Fedway also claims that the special order amounted to an unconstitutional taking of its property. *U.S. Const.,* amends. V, XIV; *N.J. Const.,* Art. I, par. 20. Fedway points to the *nunc pro tunc* character of the special ruling (namely, the proscription of sales of Schieffelin products that Fedway had purchased after July 23, 1981) as evidence of the constitutional violation. It has long been recognized that excessive governmental regulation under the police power may be so onerous as to trigger a compensable event under constitutional law. "[H]ow much [regulation] is too much depends on the facts of each case." *Lom-Ran v. Dep't. of Environmental Protection,* 163 *N.J.Super.* 376, 386 (App.Div.1978).

We conclude for several reasons that Fedway's claim must fail. In the first place, the prohibition against sales of Schieffelin products is not permanent. *Compare Lom-Ran, supra* (a temporary sewer connection ban, which might have lasted for two years until a sewage treatment plant was upgraded, did not

amount to a taking), *with Morris County Land Improvement Co. v. Parsippany-Troy Hills Tp., 40 N.J. 539 (1963)* (zoning ordinance forbidding virtually any use of plaintiff's swampland constituted a taking). Here, Fedway's disability will disappear whenever Schieffelin complies with the Director's order. *But cf. Lomarch Corp. v. Mayor of Englewood, 51 N.J. 108 (1968)* (Official Map Act, which gave municipality a one year option to dedicate land for public use, required compensation for the one year period). Secondly, the special ruling, issued in September, 1981, prohibited the sale of Schieffelin products purchased or acquired after July 23, 1982. Yet the Director had already issued an interim order on July 20, 1981, prohibiting all New Jersey wholesalers from buying from Schieffelin *nunc pro tunc* as of June 30, 1981. Thus, the special ruling prohibited selling those Schieffelin products that it had purchased in violation of the Director's interim order.

Even as to those products that Fedway had purchased prior to, but had not received until after, July 23, 1981, the law does not necessarily call for compensation. See *Andrus v. Allard, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979).* That case involved a challenge to regulations that banned transactions in birds or bird parts legally killed before they became protected by law. Dealers in Indian artifacts that were partially composed of the feathers of protected birds complained that the ban against selling pre-existing artifacts constituted an unlawful taking. The Court upheld the regulations even though they prevented the most profitable use of the artifacts.

> The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them. Rather, a significant restriction has been imposed on one means of disposing of the artifacts. But the denial of one traditional property right does not always amount to a taking. * * In this case, it is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds. [*Id.* at 65–66, 100 *S.Ct.* at 326–327, 62 *L.Ed.2d* at 222–23.]

Similarly, the Director's special ruling did not compel the surrender of the Schieffelin products. It is conceivable that Fedway could dispose of them other than by sale (for instance,

as bonuses to their employees); it is also possible for Fedway to sell them out of state.

For the foregoing reasons, we find that the special ruling did not amount to an unconstitutional taking.

Judgment affirmed.

*For affirmance*—Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—5.

*For reversal*—None.