777 A.2d 1

ROMAN CHECK CASHING, INC., A NEW JERSEY CORPORATION, APPELLANT–RESPONDENT, v. NEW JERSEY DEPARTMENT OF BANKING AND INSURANCE, RESPONDENT–APPEL-LANT.

Argued September 25, 2000—Decided July 18, 2001.

*Jessica L. Furey*, Assistant Attorney General, argued the cause for appellant (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney; *Nancy Kaplen*, Assistant Attorney General, of counsel; *Thomas M. Hunt*, Deputy Attorney General, on the briefs).

*Joseph J. Bell, Jr.* argued the cause for respondent (*Joseph J. Bell & Associates*, attorneys).

*Robert E. Rochford*, submitted a brief on behalf of amicus curiae, New Jersey Check Cashers Association (*Winne, Banta, Rizzi, Hetherington & Basralian*, attorneys; *Gerald Goldman*, of counsel; *Mr. Rochford, Donald A. Klein* and *Brian J. Neff*, on the brief).

The opinion of the Court was delivered by

PORITZ, C.J.

In the New Jersey Check Cashers Regulatory Act of 1993, *N.J.S.A.* 17:15A–30 to –52 (the Act), the Legislature revised and expanded the regulatory framework for the business of cashing checks in this State. Assembly Financial Institutions Committee, *Statement to Assembly Bill No. 1323*, at 1 (May 17, 1993). The Act provides for the licensing of check cashing businesses by the Department of Banking and Insurance (Department) and sets maximum fees for check cashing services offered by licensees, as had its predecessor statute. *See N.J.S.A.* 17:15A–33, –43; *see also* The Check Cashing Law of 1951, *N.J.S.A.* 17:15A–1 to –29 (repealed by *L.* 1993, *c.* 383, § 24, effective April 11, 1994). Relevant to this appeal, a new limitation on such businesses appears in *N.J.S.A.* 17:15A–41(e), which states that an office for check cashing will not be licensed if it is "located within 2,500 feet of an existing office." Plaintiff, Roman Check Cashing, Inc., a New Jersey corporation located in the town of Dover, challenges this limitation on substantive due process, equal protection and commerce clause grounds under the United States and New Jersey Constitutions.[1]

---

[1] Plaintiff also challenges *N.J.S.A.* 17:15A–50(b), the exempt entities provision of the Act. *Infra* Part V.

## I

Plaintiff applied for a check cashing license from the Department on August 21, 1997 to conduct business on the premises of its supermarket in downtown Dover. The application, when complete in December 1997, met all of the Act's conditions and requirements except that its proposed location was 1,004 feet from an existing check cashing business. By April 1998, the Department had not rendered a licensing decision. Plaintiff then brought this lawsuit as a mandamus proceeding to compel the Department to take action on the license, and to obtain a ruling declaring the distance requirement unconstitutional. When the application was denied on May 19, 1998, solely because of location, the matter was removed to the Appellate Division as an appeal from a final agency decision under *Rule* 2:2–3(a)(2).

The Appellate Division held that the distance requirement constitutes a violation of substantive due process and is unconstitutional. *Roman Check Cashing, Inc. v. New Jersey Dep't of Banking & Ins.*, 324 *N.J.Super.* 58, 65, 734 *A.*2d 346 (1999). The court could find "no rational basis for the regulation" and therefore concluded that because "it is indeed arbitrary, capricious and unreasonable ... the regulation cannot stand." *Ibid.* The Department appealed as of right pursuant to *Rule* 2:2–1(a)(1) and sought a stay of judgment from this Court. When the stay was denied, plaintiff's application was approved pending the outcome of the appeal. In a letter to plaintiff dated October 13, 1999, the Department stated: "[W]e note that an appeal of the court ruling invalidating the distance requirement ... is pending, and that its outcome may affect the validity of your license."

We granted *amicus curiae* status to the New Jersey Check Cashing Association, an industry lobbying group.

## II

Plaintiff primarily argues that *N.J.S.A.* 17:15A–41(e) violates its substantive due process rights under both the federal and

state constitutions. In cases raising substantive due process claims under our state constitution, this Court uses the "standards developed by the United States Supreme Court under the federal Constitution." *State Farm Mut. Auto. Ins. Co. v. State*, 124 *N.J.* 32, 46–47, 590 *A.*2d 191 (1991) (citing *Hutton Park Gardens v. Town Council*, 68 *N.J.* 543, 350 *A.*2d 1 (1975)). Thus, our analysis of plaintiff's claim is the same under both constitutions.

■ We begin with the fundamental principle that a presumption of validity attaches to every legislative enactment. *Board of Educ. v. Caffiero*, 86 *N.J.* 308, 318, 431 *A.*2d 799, *appeal dismissed*, 454 *U.S.* 1025, 102 *S.Ct.* 560, 70 *L.Ed.*2d 470 (1981); *Fried v. Kervick*, 34 *N.J.* 68, 74, 167 *A.*2d 380 (1961). Particularly in the sphere of economic regulation, we have deferred to policy judgments of the Legislature. *E.g.*, *Friedman v. Rogers*, 440 *U.S.* 1, 17, 99 *S.Ct.* 887, 898, 59 *L.Ed.*2d 100, 114–15 (1979); *In re PSE & G*, 167 *N.J.* 377, 394–95, 771 *A.*2d 1163 (2001); *see also United States v. Lopez*, 514 *U.S.* 549, 606, 115 *S.Ct.* 1624, 1653, 131 *L.Ed.*2d 626, 668 (1995) (Souter, J. dissenting) (commenting that "deference to legislative policy judgments on commercial regulation became the powerful theme under both the Due Process and Commerce Clauses"). Judicial reluctance to interfere with the regulation of economic affairs by the legislative branch of government is longstanding, with the result that both the federal courts and our courts have invariably upheld economic regulation challenged on substantive due process grounds.

■ When the means chosen bear a rational relationship to a legitimate state objective and are not arbitrary, capricious, or unreasonable, courts will sustain a legislative enactment. *Williamson v. Lee Optical*, 348 *U.S.* 483, 487–88, 75 *S.Ct.* 461, 464, 99 *L.Ed.* 563, 571–72 (1955); *Nebbia v. New York*, 291 *U.S.* 502, 537, 54 *S.Ct.* 505, 516, 78 *L.Ed.* 940, 957 (1934); *Brown v. City of Newark*, 113 *N.J.* 565, 572, 552 *A.*2d 125 (1989); *Joseph H. Reinfeld, Inc. v. Schieffelin & Co.*, 94 *N.J.* 400, 413, 466 *A.*2d 563 (1983); *Board of Educ., supra*, 86 *N.J.* at 318, 431 *A.*2d 799; *Robson v. Rodriquez*, 26 *N.J.* 517, 522, 141 *A.*2d 1 (1958). More-

over, in considering that relationship, courts will not invalidate economic regulation because they believe it to be unwise or bad policy. That principle is embedded in our law. As the United States Supreme Court said so clearly in 1955, "The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson, supra,* 348 *U.S.* at 488, 75 *S.Ct.* at 464, 99 *L.Ed.* at 572. Our Court has similarly stated, "We do not sit as a body reviewing the wisdom of legislative decisions.... If the statute does not violate the Constitution but is merely unwise or based on bad policy, then ... it is for the Legislature rather than this Court to deliver a finishing blow to it." *Board of Educ., supra,* 86 *N.J.* at 318, 431 *A.*2d 799 (citations omitted). Finally, the means chosen by the Legislature need not be precise, or even the best way to achieve the state objective. *Williamson, supra,* 348 *U.S.* at 487–88, 75 *S.Ct.* at 464, 99 *L.Ed.* at 571–72. Our task is simply to ask whether the statute is rationally related to the public health, safety or welfare. *Brown, supra,* 113 *N.J.* at 571, 552 *A.*2d 125.

In sum, our Court will not second-guess the Legislature in such cases, nor will we substitute our judgment for that of its members. We will presume support for economic regulation unless presented with evidence "that preclude[s] the possibility that there could have been any set of facts known to the legislative body or which could reasonably be assumed to have been known which would rationally support a conclusion that the enactment is in the public interest." *Hutton Park Gardens, supra,* 68 *N.J.* at 565, 350 *A.*2d 1; *see also In re C.V.S. Pharmacy Wayne,* 116 *N.J.* 490, 498, 561 *A.*2d 1160 (1989) (stating that courts should approve "means [chosen] ... unless [they] ... are so irrelevant as to be irrational").

### III

The question before us is whether *N.J.S.A.* 17:15A–41(e) can be sustained against a substantive due process challenge.

Plaintiff claims that section 41(e) of the statute is not rationally related to any legitimate state objective, indeed, that it is so wide of the mark as to be merely arbitrary. Plaintiff accepts the Appellate Division's characterization of the State's interest in regulating check cashing businesses—to ensure their economic viability and to prevent money laundering—but contends that the 2,500 foot distance requirement does not advance either of those purposes. That is because the requirement establishes artificial boundaries and does not distinguish between rural areas and densely populated urban centers. In plaintiff's view, without a proper foundation for a 2,500 foot limitation the provision must fall.

The Department disputes that there is no rational relationship between the means chosen, the distance requirement, and legitimate state objectives. By preventing geographic market saturation, the distance requirement helps preserve the economic health and stability of check cashing businesses. Use of those businesses for money laundering is less attractive when profits are reasonable and the industry operates on a sound footing. The Department also claims that the distance requirement is both even-handed and administratively convenient.

*Amicus curiae*, the Check Cashers Association (Association), represents to the Court that entry restriction, in the form of the distance requirement, is directly related to the continued maintenance of the statutory limit on check cashing fees imposed by *N.J.S.A.* 17:15A–43. The Association explains that various provisions of the Act are designed to control criminal activities, *e.g.*, background checks, *N.J.S.A.* 17:15A–36, and recordkeeping, *N.J.S.A.* 17:15A–44, but that the 2,500 foot restriction is directly connected to the continued health and vitality of the check cashing industry under the statutory fee limit. The rationale proffered by the Association is simple: the limitation on fees increases the check casher's reliance on volume to achieve reasonable profits, and therefore, restricting the entry of new businesses is critical to industry stability.

## IV

### A

In most cases, it is not difficult to understand what the Legislature intended to do and why—the statute is clear on its face and the relationship between the legislative purpose and the means employed is obvious. Many statutes have a "purposes" section that is self-explanatory, and committee statements that directly address legislative intent. *See, e.g., N.J.S.A.* 48:3–50 (stating legislative findings in enacting Electric Discount and Energy Competition Act, *N.J.S.A.* 48:3–49 to –98); *N.J.S.A.* 2A:50–54 (stating legislative findings in enacting Fair Foreclosure Act, *N.J.S.A.* 2A:50–53 to –68); *see also Pa. Stat. Ann.* tit. 63, § 2302 (West Supp.2001) (stating purposes in enacting Check Casher Licensing Act, 63 *Pa. Cons.Stat.* §§ 2301 to 2334). In some cases, however, the reason the Legislature has chosen to enact a specific statutory provision is neither obvious nor stated. Although "courts will readily impute a proper governmental purpose or interest ..., and, if need be, infer an adequate factual basis to support legislative regulations, even in the absence of particular purposes or specific findings being expressed by the lawmakers," *Bell v. Township of Stafford,* 110 *N.J.* 384, 394, 541 *A.*2d 692 (1988), when the governmental interest cannot readily be inferred, we turn then to extrinsic aids. In those cases, committee hearings, similar statutes from other states that contain explanatory language, case law on the same subject, and other generally available relevant documents serve as guides for the courts. *Hamilton Amusement Ctr. v. Verniero,* 156 *N.J.* 254, 271, 716 *A.*2d 1137 (1998) (stating that governmental interest "can be satisfied by reference to studies pertaining to other jurisdictions" and legislative history); *see also Wingate v. Estate of Ryan,* 149 *N.J.* 227, 236, 693 *A.*2d 457 (1997) (stating well-established principle that "[e]xtrinsic aids, such as legislative history, committee reports, and contemporaneous construction, may be used to help resolve ... the true intent of the Legislature").

Because the purpose of the 2,500 foot distance requirement is not immediately obvious, the Appellate Division asked the parties to provide additional information relating to the Act's legislative history and, more directly, the reasons for the distance requirement. In their joint submission to the Court, the Department and plaintiff stated "that there is no indication that there was any public hearing on [the Act]," although they were able to find, among other things, a copy of the May 17, 1993 testimony of Commissioner Jeff Connor before the Assembly Financial Institutions Committee addressing Assembly Bill 1323, an early version of the Act. This Court granted the Department's motion to further supplement the record before us with additional materials. That submission, prepared initially by the Association, contained an April 1993 economic study of the State's licensed check cashing industry that had been prepared by Ernst & Young for the Association, an April 1993 economic study discussing entry restrictions for the New York check cashing industry, also prepared by Ernst & Young for the Association's New York counterpart, and prepared testimony of the Association's General Counsel, Gerald Goldman, delivered at the public hearing before the Assembly Financial Institutions Committee on May 17, 1993. Most important, the reports and Goldman's testimony specifically addressed the rationale for the distance requirement.

### B

The record before the Court, as supplemented, demonstrates that the distance requirement, the means chosen, is rationally related to maintaining the statutory fee cap, a legitimate state objective.

An August 1988 report by the State Commission of Investigation (SCI), which was the culmination of the SCI's investigation into the State's check cashing industry, found that check cashing facilities were used by many individuals and businesses to carry out a variety of criminal activities such as tax evasion and money laundering. *See Statement to the United States Subcommittee on Investigation,* James R. Zazzali, Chairman, S.C.I., February 27, 1992. That finding played a substantial role in the development of the Act and repeal of the 1951 statute in that many of the Act's

provisions are designed to ensure accountability and prevent those activities. Relevant to our inquiry here, the SCI found "that privately operated check cashing businesses serve a vital social' and economic function for a significant segment of the [State's] population [that does] not or cannot maintain contact with regular banking institutions." *Ibid.; see also Liao v. New York State Banking Dep't.*, 74 *N.Y.*2d 505, 549 *N.Y.S.*2d 373, 548 *N.E.*2d 911, 912 (1989) (noting rise in use of check cashing facilities because traditional institutions have reduced personal consumer services). The statutory fee cap protects those consumers.

In the New Jersey report submitted to the Assembly Committee there is an analysis of check cashers' profit margins at various statutory fee caps. Of significance, the report states that if the high entry rate of new locations into the business "continue[s] or accelerate[s] in markets already served by industry locations, greater pressure for fee increases will develop." The New York report evaluated the relative economic benefits of having a three-tenths of a mile distance requirement for check cashing locations in New York, and similarly concluded that new check cashers entering a local market served by an existing location would significantly reduce industry profitability, creating a need for fee increases. That report stated: "Entry regulation should prevent some of the volume declines that check cashers have been experiencing, which causes profitability to decline, which in turn raises the fee increase issue." The Association's General Counsel relied on both reports when he testified before the Assembly Financial Institutions Committee that the proposed distance requirement would "guard against the saturation of ... licenses in areas already being served." He stated that in this industry high volumes are needed to offset a combination of fixed costs and fee caps, and to ensure earnings. Geographic market saturation increases the pressure to raise the statutory rate [2] to the detriment of both check cashers and consumers.

---

[2] The fee cap is subject to increase by the Department after consideration of, among other things, "a reasonable profit for check cashers." *N.J.S.A.* 17:15A–

We note that the industry's position on this issue did not have universal support. As the Appellate Division points out, "the Department had opposed the [distance] restriction because it ... would 'permit monopolization of businesses, especially in city areas.' " *Roman Check Cashing, Inc., supra,* 324 *N.J.Super.* at 63 n. 1, 734 *A.*2d 346 (quoting advice from the Department). Although Governor Florio apparently considered eliminating the requirement in his conditional veto of the Act, the legislative sponsors convinced Governor's Counsel that the provision should be preserved. When the Legislature later passed the Act pursuant to the Governor's conditional veto, the 2,500 foot restriction remained.

There is much in this record to explain why the Legislature enacted the 2,500 foot distance requirement despite some dissent about its wisdom. We find that the distance requirement is rationally related to the health and stability of the industry and to maintaining the statutory fee cap, a consumer protection measure. We are cognizant of the concerns expressed by plaintiff that the means chosen are less than precise, and that location based on population density, if feasible, might have been better tailored to the ends sought. As we said most recently in *In re PSE & G, supra,* 167 *N.J.* at 394–95, 771 *A.*2d 1163, the choice is not ours, it is the Legislature's. We cannot say that the choice is arbitrary.

## V

We briefly address plaintiff's equal protection claim.[3] Plaintiff alleges that *N.J.S.A.* 17:15A–50(b) improperly differenti-

---

43(f); *see State Farm Mut. Auto. Ins. Co., supra,* 124 *N.J.* at 45–51, 590 *A.*2d 191 (explaining that rate regulation by government that meets constitutional requirements must allow "a return sufficient to assure [the entity's] financial health").

[3] Plaintiff also now claims that the distance requirement violates the dormant commerce clause. That argument was raised by supplemental brief in the Appellate Division for the first time. That court declined to consider it because it was not timely raised. We consider the claim to be without sufficient merit to warrant discussion.

ates between check cashing businesses and other like businesses. That section exempts "any federal or State chartered bank, savings bank, savings and loan association, credit union or ... any automated cash machine" from the requirements of the Act. Plaintiff believes that that exemption results in a violation of equal protection under both the federal and state constitutions.

Preliminarily, we note that the Act does not implicate any suspect or quasi-suspect classification or any fundamental right. *See generally Brown, supra,* 113 *N.J.* at 572–74, 552 *A.*2d 125 (describing applicable inquiry for equal protection analysis under federal and state constitutions). The Attorney General asserts that plaintiff does not even meet the threshold for an equal protection challenge—that check cashing businesses are similarly situated in respect of the *N.J.S.A.* 17:15A–50(b) exempt entities. We agree. The broad range of services provided by banks and savings and loan associations distinguishes them from check cashing businesses such that they are reasonably subject to entirely different requirements. *See generally City of Cleburne v. Cleburne Living Ctr.,* 473 *U.S.* 432, 439, 105 *S.Ct.* 3249, 3254, 87 *L.Ed.*2d 313, 320 (1985) (stating that "Equal Protection Clause of the Fourteenth Amendment ... is essentially a direction that all persons similarly situated should be treated alike"); *Greenberg v. Kimmelman,* 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985) (stating that equal protection under state constitution "seeks to protect ... against the unequal treatment of those who should be treated alike").

## VI

 Finally, as we stated earlier, the basis for the distance restriction challenged herein cannot readily be inferred from the statute itself. Because the Appellate Division did not have a full record before it prior to the issuance of its opinion, the panel lacked legislative history that could have informed its decision. When, in those circumstances, a stay was denied by both the Appellate Division and this Court, the Department issued a license

approval to plaintiff, noting "that an appeal of the court ruling invalidating the distance requirement ... is pending, and that its outcome may affect the validity of your license."

We are troubled by this course of events. Plaintiff has been operating its check cashing business since October 1999, almost two years now. The Department's approval, although arguably conditional, is confusing. Moreover, that approval issued during the period when the distance requirement could not be enforced. We therefore sustain the validity of plaintiff's check cashing license. Plaintiff's challenge to the constitutionality of *N.J.S.A.* 17:15A–41(e) and *N.J.S.A.* 17:15A–50(b) is rejected, and the judgment of the Appellate Division is reversed.

STEIN, J., concurring in part and dissenting in part.

With one exception, I join in the opinion of the Court. Although sympathetic to plaintiff's position, I find no principled basis on which to sustain the statute and preserve plaintiff's license. Accordingly, I would uphold the statute and invalidate the license.

*For reversal*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG and VERNIERO—5.

*Opposed*—None.